No. 59,277
No. 59,278

EARL B. WILLIAMS and LORETTA WILLIAMS, his wife, and DON WILLIAMS, *Appellees,* v. AMOCO PRODUCTION COMPANY, *Appellant.*

(734 P.2d 1113)

Opinion filed March 27, 1987.

Steven D. Gough, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and Bradley W. Denison, of the same firm, and Charles T. Krol, Stephen F. Gates, and Mary S. Haskins, of Amoco Production Company, of Denver, Colorado, were with him on the briefs for appellant.

John T. Conlee, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and Rex G. Beasley, of the same firm, and Lee E. Nordling, of Kramer, Nordling, Nordling & Tate, of Hugoton, were with him on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is an action for damages to real property resulting from the presence of natural gas in plaintiffs' irrigation water. The plaintiff landowners (hereafter plaintiffs or appellees) claim the natural gas escaped from two of the defendant's Hugoton gas wells. A jury returned a verdict in favor of the plaintiffs for $656,006.40, and the defendant, Amoco Production Company, appeals.

Irrigation water in southwest Kansas is derived primarily from water-bearing aquifers known as: (1) The Pleistocene deposits, located at a depth of approximately 275 feet; (2) the Ogalalla formation, found at a depth of between 275 and 350 feet; and (3) the Dakota and Cheyenne formations, located below the Ogalalla. The Pleistocene is the best aquifer, while the Ogalalla is better than the Dakota or Cheyenne formations. This is because the Dakota and Cheyenne formations are composed of fine-grained sandstone, while the Ogalalla is made up of coarse sand and gravel and thus has more porosity and permeability.

The appellees, Earl and Loretta Williams and their son Don Williams, own and farm approximately 2,500 acres of land located northwest of Ulysses. They operate five irrigation wells on this acreage: (1) A well completed in the Ogalalla on Section 29; (2) a well completed in the Ogalalla on Section 30; (3) a deep well drilled in 1968 through the Ogalalla and into the upper Dakota on Section 31; (4) a deep well drilled to 620 feet, through the Ogalalla, to the Dakota and Cheyenne on Section 32; and (5) a similar deep well drilled in 1971 to 576 feet on Section 34.

In the spring of 1968, appellees' irrigation well on Section 32 occasionally quit running. An irrigation supply company (Weber

Supply) examined the well several times but was unable to pinpoint the problem until an employee lit a cigarette, threw his match down, and natural gas ignited near the wellhead.

Nearby gas well operators were notified of the problem and in July of 1968, Amoco discovered problems with two of its Hugoton gas wells: the E. B. Williams No. 1, located on Section 29, immediately north of Section 32; and the Redinger Gas Unit B No. 1 on Section 33, immediately east of Section 32.

Amoco's tests on the E. B. Williams well revealed 260 pounds of pressure between the 10 and 3/4-inch surface casing and the seven-inch production casing, indicating a leak in the production casing. The well was repaired on July 31, 1968. The repair consisted of the installation of a 4 and 1/2-inch production liner inside the production casing with a packer set at 2,329 feet. A packer is a device used to seal the space between the production casing and the repair liner. Amoco also installed a pressure gauge to monitor leaks in the space between the surface casing and production casing and between the production casing and the liner.

A leak was also discovered in the Redinger well on July 17, 1968. Unlike the E. B. Williams well, a pressure check on the Redinger well showed no pressure between the surface casing and production casing. Amoco concluded that corrosive fluids in the Glorietta formation at 1,300 feet had eaten through the production casing, permitting water and sand to fall inside the production casing to the bottom of the production liner, extinguishing the flow of gas. Thus, Amoco contends, no natural gas leaks ever occurred in this well. The same repair procedure was used on the Redinger well as was used on the E. B. Williams well and pressure gauges were installed to detect leakage.

In addition to repairing its own gas wells, Amoco attempted to restore production to plaintiffs' irrigation well on Section 32. By mid-1969, after a series of modifications to plaintiffs' equipment, steady production was restored at the rate of 1,300 to 1,400 gallons per minute. Prior to the natural gas leak, plaintiffs claim, the well could pump as much as 2,200 gallons per minute. Approximately one year after Amoco completed modification of appellees' well, Weber Supply tested the well at 1,420 gallons per minute.

In February 1970, appellees filed an action in the United States District Court for the District of Kansas, seeking the recovery of temporary damages for crop loss on Section 32, and incidental equipment expense. Prior to trial, appellees amended their claim to include temporary damages for crop loss in the years 1968 through 1973. Appellees declined to follow the trial court's suggestion that they amend their claims to seek permanent damages. A jury returned a verdict in favor of the appellees and against Amoco for $100,000 plus interest.

In 1971, appellees drilled a new deep irrigation well on Section 34 to replace a shallow well. The new well was drilled to a depth of 576 feet and was completed through the Ogalalla, Dakota, and Cheyenne formations. The designers of the well told appellees the well was capable of producing 1,500 gallons per minute. A well test conducted by Weber Supply on July 19, 1971, showed the well would produce 990 gallons per minute without drawing any air.

The well produced without problems for approximately two years. Sometime in July of 1973, appellees discovered natural gas in the well. The presence of natural gas in the well caused no substantial damage because appellees by this time knew how to produce water by throttling the engine back a little, thereby controlling the "surging" problem caused by the presence of gas in the water. Appellees never calculated the reduction in water production from the well due to throttling back the engine to control the surging. However, the well pumped an average of 1,000 gallons per minute in 1975.

During the mid-1970's, a prohibition was placed upon the drilling of additional irrigation wells in southwest Kansas. This restriction was due to the significant decline in the water table caused by existing wells. As the water table has dropped over the years, a resulting decline in productivity in the area's irrigation wells has also occurred. Appellees' wells are no exception.

Appellees eventually filed two lawsuits which were consolidated for trial. The first lawsuit was filed in the district court of Grant County on July 30, 1975, seeking temporary damages for crop loss on the NW/4 of Section 34. The second lawsuit was filed on February 11, 1976, seeking temporary damages for crop loss on Section 32 occurring since February 22, 1974 (the date of the judgment received in the federal court case).

The nature of the cases remained the same until the district court ruled on June 4, 1982, that appellees' damages, if any, are permanent in nature and not temporary. Thereafter, in May of 1985, appellees were allowed to amend their lawsuit over Amoco's objection, to add permanent damage claims with respect to land owned by the appellees in Sections 18, 19, 20, 29, 30 and 31. Thus, the case was tried on the theory that all of appellees' 2,500 acres of land had been permanently damaged in 1974 by the presence of natural gas in the aquifer.

A jury trial was had and on September 27, 1985, the jury found for the appellees and awarded damages in the amount of $656,006.40. Amoco appeals.

Amoco first contends the trial court erred in overruling Amoco's motions for summary judgment, directed verdict, and judgment notwithstanding the verdict because appellees' claim for permanent damages was barred by the statute of limitations.

Appellees originally filed suit for temporary damages for crop loss on Sections 32 and 34. The trial judge, in June of 1982, ruled that appellees' damages, if any, were permanent in nature, and appellees have not cross-appealed from that ruling. Amoco argues that appellees' claim for permanent damages accrued more than two years before suit was filed on July 30, 1975.

The parties agree that the two-year statute of limitations provided for in K.S.A. 60-513(a)(4) is applicable to the present action. However, they disagree as to when the limitations period commenced.

K.S.A. 60-513(b) provides:

"Except as provided in subsection (c) of this section, the cause of action in this action [section] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall the period be extended more than ten (10) years beyond the time of the act giving rise to the cause of action."

In *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984), this court succinctly interpreted K.S.A. 60-513(b) as follows:

"The rule which has developed is: The statute of limitations starts to run in a tort

action at the time a negligent act causes injury if both the act and the resulting injury are reasonably ascertainable by the injured person. . . . We hold the use of the term 'substantial injury' in the statute does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent."

Amoco argues that sometime prior to July 16, 1973, appellees discovered natural gas in their irrigation well on Section 34 and that appellees knew from past experience with Section 32 that it was a problem which would not abate. Amoco further contends the appellees were aware as early as 1969 of the problems with natural gas in their irrigation well on Section 32. Thus, Amoco reasons, appellees sustained substantial injury which was reasonably ascertainable more than two years before suit was filed on July 30, 1975.

Amoco argues that this court's analysis in previous cases concerning water contamination or flooding is applicable here. Amoco points out that generally, in an action for permanent damages resulting from water contamination or flooding, the cause of action is deemed to have arisen when the contamination or flooding is discovered. See, *e.g., Henderson v. Talbott*, 175 Kan. 615, Syl. ¶ 1, 266 P.2d 273 (1954). However, this argument ignores the fact that the present action was originally brought for temporary damages. In *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, 263, 662 P.2d 1203 (1983), this court discussed when a cause of action accrues for temporary damages:

" 'Where the injury or wrong is classified by the courts not as original or permanent, but as temporary, transient, recurring, continuing or consequential in nature, it has been held that the limitation period starts to run only when the plaintiffs' land or crops are actually harmed by overflow, and for purposes of the statute of limitations, each injury causes a new cause of action to accrue, at least until the injury becomes permanent.' " (Quoting *Gowing v. McCandless*, 219 Kan. 140, 144, 547 P.2d 338 [1976].)

Since appellees' actions were originally filed for temporary damages, each injury caused a new cause of action to accrue. The court ordered the action amended to one for permanent injury because, during the pendency of the action, the injury had changed from temporary to permanent. Accordingly, we hold appellees' claims were timely filed and are not barred by the two-year statute of limitations as a matter of law.

Amoco next asserts the trial court erred in allowing appellees to amend their claim four months prior to trial.

From the time this lawsuit was filed in July of 1975, the appellees had claimed damages only for crop loss to Sections 32 and 34. In May of 1985, the trial court permitted appellees to amend their lawsuit to add a permanent damage claim with respect to six tracts of land located in Sections 18, 19, 20, 29, 30, and 31, covering 1,700 additional acres. Trial was held four months later, in September 1985.

K.S.A. 60-215 provides that leave to amend "shall be freely given when justice so requires." A trial court is given broad discretionary power under 60-215 to permit the amendment of pleadings, and its actions thereto will not constitute reversible error unless it affirmatively appears that the amendment allowed or denied is so material it affects the substantial rights of the adverse party. *Kennedy v. City of Sawyer,* 228 Kan. 439, 447, 618 P.2d 788 (1980); *Ballhorst v. Hahner-Foreman-Cale, Inc.,* 207 Kan. 89, 92, 484 P.2d 38 (1971).

Amoco argues its rights were substantially prejudiced by appellees' amendment to the pleadings nearly ten years after the action was originally filed. Amoco contends that the original pleadings did not alert Amoco that it should accumulate evidence to defend damage claims other than those asserted with respect to Section 32 and the NW/4 of Section 34. Amoco also argues appellees' amendment was barred by the statute of limitations for the reasons previously discussed.

Appellees counter by arguing that under K.S.A. 60-215(c) their 1985 amendment relates back to the original petition and thus does not violate the statute of limitations. K.S.A. 60-215(c) states:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Amoco concedes that there are no exceptions to K.S.A. 60-215(c), but notes that this court has held that the rule should not be applied where it would be inequitable or work an injustice to strictly apply the doctrine of relation back. See *James v. City of Wichita,* 202 Kan. 222, 225, 447 P.2d 817 (1968).

A trial court is given great latitude in permitting amendment of

pleadings and its rulings will not be disturbed on appeal except for abuse of discretion. We find no showing of abuse of discretion.

Amoco next asserts the trial court erred in admitting the opinions and exhibits of appellees' appraiser, Timothy Hagemann.

The measure of damages for permanent injury is the difference in the fair market value of the land before and after injury. *Kiser v. Phillips Pipe Line Co.*, 141 Kan. 333, 336, 41 P.2d 1010 (1935); *Hall v. Galey*, 126 Kan. 699, 703, 271 Pac. 319 (1928). Thus, appellees' appraiser testified concerning the fair market value of appellees' land in 1974 before any damages were caused by natural gas in the aquifer. Appellees' appraiser further testified regarding the value of the land following the alleged injury.

In determining the value of appellees' land in 1974, Hagemann assumed that *all* of appellees' property was fully irrigated. However, the evidence clearly showed that there were no irrigation wells on Sections 18, 19, and 20 and those Sections were used by appellees solely for dry land farming. Amoco contends the trial court erred in admitting this testimony because the appraiser improperly assumed the land had been changed to its most profitable use. Appellees, on the other hand, argue that Amoco's "criticism" of Hagemann's testimony goes to its weight rather than to its admissibility. Appellees further contend that Hagemann properly considered the irrigation potential of appellees' land in determining its best and most advantageous use.

Amoco concedes that in determining what is fair compensation for damaged land, the owner is generally entitled to show the best and most advantageous use to which the property may be put. *Steifer v. City of Kansas City*, 175 Kan. 794, 799-800, 267 P.2d 474 (1954). However, Amoco argues this rule does not permit the owner to assess damages by assuming capital improvements have already been made to the land in order to utilize its highest and most advantageous use.

This argument has merit. 22 Am. Jur. 2d, Damages § 133, p. 193, states:

"The use to which plaintiff is putting his real estate will affect, but not place a limit on, its value. . . . To the extent that other uses of the land in question would be more profitable, these other uses may be considered by the court to the

extent that they affect the present value of that land. This may be true even though plaintiff has not taken advantage of that value. Notice, though, that it is the present value of the land in its condition immediately prior to the tort which is important. The court will not require the defendant to pay damages based upon a value which assumes that the land had been changed (for example, from wild to cultivated land) to the most profitable use."

Thus, in determining the present value of land, a distinction must be made between land which *may be* irrigated and land which *is* irrigated.

We hold the trial court erred in allowing Hagemann to testify regarding the value of Sections 18, 19, and 20 as if those Sections were irrigated land prior to 1974.

Amoco also argues the trial court erred in permitting Hagemann to testify that after the injury, Sections 29, 30, and 31 had no value as irrigated land. Yet, each of these Sections contained productive irrigation wells which appellees have continued to utilize extensively despite the presence of gas in other wells.

Hagemann also assumed that plaintiffs' land on Section 32 and the NW/4 of Section 34 had no value as irrigated land after 1974 because of the confirmed presence of natural gas in those wells. Yet, the evidence showed that despite the presence of natural gas, the wells in Sections 32 and 34 had been appellees' best-producing wells in terms of hours pumped, gallons per minute, and acres irrigated.

This court has often held that improvements on the land must be considered in determining its fair market value. For example, in *Hoy v. Kansas Turnpike Authority*, 184 Kan. 70, 334 P.2d 315 (1959), the court held it was error to allow a witness in a condemnation case to testify concerning the value of land where the witness failed to take into account the existence of a water well, trees, stone corral fences, and buildings. The court noted that improvements located upon land which is to be condemned are not to be valued separately but are a part of the real estate and must be considered in determining the value of the land taken. 184 Kan. at 74.

We hold the trial court committed reversible error in permitting Hagemann to testify that the land in Sections 29, 30, 31, 32, and 34 had value only as dry land after 1974.

Amoco next alleges the trial court erred in admitting the

opinion testimony of appellees' hydrologist, Dr. Henry Beck, because his testimony was based on speculation rather than fact.

Beck's opinion was utilized by the appellees on two subjects: (1) Whether Amoco's gas wells on Sections 29 and 33 continued to leak after repairs were made in 1968; and (2) whether Beck would advise a prospective purchaser that natural gas was present in the water in Sections 18, 19, and 20.

A trial court has wide discretion in allowing the testimony of expert witnesses and the use of such testimony goes to the weight of the evidence and not its admissibility. *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, Syl. ¶ 6, 665 P.2d 757 (1983).

We hold the trial court did not err in permitting Beck's testimony with regard to the continued leak in Amoco's gas wells in Sections 29 and 33, but the trial court erred in permitting Dr. Beck to testify about the presence of natural gas in the Cheyenne and Dakota aquifers in Sections 18, 19, and 20, absent proper foundation.

Next, we turn to the issue of whether the trial court improperly applied a strict liability standard to the facts of this case. The trial court instructed the jury as follows:

"When a company brings or produces something on its property which is harmless to others so long as it is confined, but which is harmful if it should escape, the company has a duty to prevent it from escaping and is legally responsible for the damages that ensue if the company does not succeed in confining it to its own property, regardless of the care exercised."

Amoco argues the jury should have been instructed on the theory of negligence, rather than strict liability. However, the trial court specifically held that the appellees failed to produce any evidence of negligence per se on the part of Amoco. Appellees did not cross-appeal from that finding. The court stated:

"Let the record show that I declined to submit this case on the basis of negligence because I don't think the plaintiffs produced any evidence of negligence, per se, on behalf of the defendants. Therefore, that issue does not apply."

Thus, the issue presented for review is whether strict liability applies to the escape of natural gas from Amoco's natural gas well into underground water formations and subsequently into appellees' irrigation water.

Strict liability as it pertains to the instant case means liability

imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care (*i.e.*, actionable negligence). Prosser and Keeton on Torts § 75, p. 534 (5th ed. 1984).

The doctrine of strict liability for abnormally dangerous activities is derived from the English case of *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). There, water from the defendants' reservoir broke through the disused and filled-up shaft of an abandoned coal mine and flooded the connecting mine belonging to the plaintiff. The defendants were held liable upon the theory the defendants had made a "non-natural use" of their land, which brought with it increased danger to others.

The *Rylands v. Fletcher* doctrine was initially adopted by this court in *Helms v. Oil Co.*, 102 Kan. 164, 169 Pac. 208 (1917). In *Helms*, oil refuse and poisonous substances escaped in large quantities from the defendant's oil refinery and flowed onto plaintiff's farm, causing injury to plaintiff's land and cows. The defendant argued that his business was a lawful one and he could not be liable to plaintiff in the absence of negligence. The *Helms* court disagreed, holding that the fact that a business is carried on lawfully and in accordance with ordinary methods does not relieve one from liability if the use is unreasonable and as such constitutes a nuisance. The court reasoned:

"Whether or not a use which in itself is lawful is a nuisance depends upon a number of circumstances—locality and surroundings, the number of people living there, the prior use, whether it is continual or occasional, and the extent of the nuisance and injury caused to the neighbor from the use. If the injury is slight and trivial and occurs in the development of the natural resources of the land it is not deemed to be unreasonable." 102 Kan. at 168.

The court then concluded that the oil treated by the defendant at the refinery was obtained elsewhere, and its operations had no connection with the products of the land or the development of its natural resources.

Since *Helms*, this court has applied the *Rylands v. Fletcher* doctrine in numerous cases. See, *e.g., Atkinson v. Herington Cattle Co., Inc.*, 200 Kan. 298, 436 P.2d 816 (1968) (feedlot drainage contained bacteria and nitrates which destroyed plaintiff's water supply and injured his cattle); *Klassen v. Creamery*

*Co.*, 160 Kan. 697, 165 P.2d 601 (1946) (discharge from dairy poisoned plaintiff's water supply and killed livestock); *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P.2d 953 (1934) (salt water from defendant's oil well seeped into plaintiff's water supply).

Amoco points out, however, that in cases in this court where a distributor or supplier of natural gas has been sued as a result of an explosion or fire resulting from the escape of natural gas, this court has always applied a negligence standard rather than a strict liability standard. See, *e.g., Milwaukee Ins. Co. v. Gas Service Co.*, 185 Kan. 604, 347 P.2d 394 (1959) (plaintiff's home partially destroyed by natural gas explosion); *Sternbock v. Consolidated Gas Utilities Corp.*, 151 Kan. 81, 98 P.2d 162 (1940) (natural gas caused fire which damaged plaintiff's personal property); *Hashman v. Gas Co.*, 83 Kan. 328, 111 Pac. 468 (1910) (leaking gas line caused personal injury).

The Restatement (Second) of Torts sets forth the general rule regarding strict liability in tort for abnormally dangerous activities as follows:

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

"(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous." Restatement (Second) of Torts § 519 (1976).

Section 520 of the Restatement (Second) sets out the following test for determining whether an activity is abnormally dangerous:

"In determining whether an activity is abnormally dangerous, the following factors are to be considered:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

"(b) likelihood that the harm that results from it will be great;

"(c) inability to eliminate the risk by the exercise of reasonable care;

"(d) extent to which the activity is not a matter of common usage;

"(e) inappropriateness of the activity to the place where it is carried on; and

"(f) extent to which its value to the community is outweighed by its dangerous attributes."

We have never expressly applied the Restatement (Second) test. (But see *Arnold Associates, Inc. v. City of Wichita*, 5 Kan. App. 2d 301, 615 P.2d 814 [1980] *rev. denied* 229 Kan. 669 (1981),

where the Court of Appeals adopted Sections 519 and 520 of the Restatement [Second] of Torts.) However, we hereby adopt Sections 519 and 520 of Restatement (Second) of Torts and utilize its provisions to aid in determining whether natural gas is an abnormally dangerous substance under the circumstances of this case.

Amoco contends that neither the operation of a natural gas well nor natural gas as a substance presents a high degree of risk or harm. Amoco points out that natural gas, unlike salt water, oil pollution, or chemical discharge, does not damage the fertility of the soil or growing crops; nor does it injure livestock or affect the quality of water. This is true because natural gas is in solution in the water until agitated and, upon reaching the surface, dissipates into the atmosphere. The presence of natural gas in the water-bearing aquifers has not resulted in an explosion, nor has it "polluted" nearby land or water, as is suggested in the appellees' brief. Instead, the presence of natural gas has required the appellees to reduce the rate at which water is removed from the aquifer, thereby reducing the amount of water available for irrigation of appellees' crops.

Amoco further notes that the drilling and operation of natural gas wells in the Hugoton Gas Field is a "matter of common usage" and is an appropriate activity for the place in which it is carried on—*i.e.*, it does not constitute a "non-natural use" of the land. As this court has noted in previous cases, the Hugoton Gas Field is the largest known reservoir of natural gas in the world. *Colorado Interstate Gas Co. v. State Corporation Comm.*, 192 Kan. 1, 4, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). Thus, the drilling and operation of natural gas wells in this area is a common, accepted, and natural use of the land.

In *Berry v. Shell Petroleum*, 140 Kan. at 100-01, this court stated:

"There is ample proof in this case that the oil companies soon after the development of the field found themselves overburdened with salt water. *This salt water had been harmless as long as it was left in the ground, but once it was raised to the surface of the earth it became a harmful agent. Salt water ruins drinking water and destroys vegetation.* The problem of what to do with it has long been a perplexing one here in the Midcontinent field. Be that as it may, the company has brought something on its own property which was not naturally there, harmless to others so long as it is confined to its own property, but which it knows to be mischievous if it gets on its neighbors." (Emphasis added.)

Unlike the salt water which escaped from the defendant's well in *Berry*, natural gas is not a "harmful agent" once it is raised to the surface of the earth. Nor does natural gas ruin drinking water, destroy vegetation, or injure livestock. Moreover, natural gas is not a substance which is known to be "mischievous" if it gets on the property of others.

Thus, applying the Restatement (Second) of Torts test, we hold the drilling and operation of natural gas wells is not an abnormally dangerous activity in relation to the type of harm sustained by appellees. Further, such activity does not constitute a nonnatural use of the land. Accordingly, we find the trial court improperly instructed the jury upon the theory of strict liability.

Let us now turn to the questions of negligence and nuisance. Amoco argues that since appellees did not cross-appeal, the finding that appellees failed to prove negligence is binding and may not be considered on appeal. Thus, Amoco argues if the court finds the jury was improperly instructed on a theory of strict liability, it must reverse the verdict and enter judgment for Amoco. Appellees, on the other hand, contend that the trial court's finding with respect to negligence "does not rise to the level of a judicial finding under the circumstances here present."

Appellees' argument is meritorious. The district judge's statement that he "declined to submit this case on the basis of negligence because [he didn't] think the plaintiffs produced any evidence of negligence, per se, on behalf of the defendants," was in response to objections to the instructions which had been given. As such, it was not a judgment requiring appellees to take issue by cross-appeal to preserve the question. The court had refused to instruct on negligence and was stating its reason. Where a party wins a jury verdict, it is unnecessary to cross-appeal every adverse trial ruling to preserve the issue in case of reversal and remand for a new trial.

*Johnson v. American Cyanamid Co.*, 239 Kan. 279, 718 P.2d 1318 (1986), is distinguishable. There, the defendant appealed from a jury finding that it was 100% at fault for plaintiff's injuries. However, the defendant's appeal was expressly limited to issues of plaintiff's judgment against it. Further, the plaintiff did not cross-appeal from the jury's finding that another party (Dr.

Branson) was 0% at fault. Thus, a majority of this court held we did not have jurisdiction to remand the case for retrial upon reversal of the judgment against American Cyanamid because all of the issues were fully litigated at trial and no party claimed error in the trial of said issues. 239 Kan. at 290-91. The issue in *Johnson* involved a limited appeal with the judgment against Dr. Branson specifically dismissed from the appeal. No cross-appeal was taken. Thus, the Branson judgment was specifically omitted from appellate review. This case has no similarities.

When we view the appellees' evidence of a continuing gas leak in Amoco's gas wells in the light most favorable to appellees, we find there are controverted issues of fact pertaining to breach of a duty by Amoco to appellees which should be determined by a jury. Thus, we hold this case should be remanded for a new trial on the issue of negligence. At trial, no evidence was introduced of the presence of natural gas in the aquifer on any of the Williams' land except on Section 32, and the NW/4 of Section 34. However, since there was evidence the gas leak occurred in a well on Section 29, and moved through the deep aquifer from that to Sections 32 and 34, it follows circumstantially that the aquifer under Section 29 is charged with gas. Thus, we find the motion for directed verdict at the end of appellees' case in chief should have been sustained as to all of the Williams' land except Section 29, Section 32, and Section 34. Any new trial should be limited to the damages to the S/2 and the NE/4 of Section 29, Section 32, and the NW/4 of Section 34.

Appellees next argue the trial court should have given an instruction on nuisance. Though appellees make no argument for a new trial since they won below, it follows that they believe a new trial, if awarded, should encompass the theory of nuisance.

Prosser and Keeton on Torts § 87, pp. 622-23 (5th ed. 1984), discusses the requirements for recovery on a private nuisance theory:

"[T]he tort [private nuisance] is committed only if, and in the absence of an intrusion on land amounting to an intentional entry and a trespass, the following requirements are satisfied:

"(1) The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;

"(2) There was some interference with the use and enjoyment of the land of

the kind intended, although the amount and extent of that interference may not have been anticipated or intended;

"(3) The interference that resulted and the physical harm, if any, from that interference proved to be substantial. It is this requirement and the next that is most important in distinguishing between trespassory-type invasions from those that are actionable on a nuisance theory. Any intentional and unprivileged entry on land is a trespass without a showing of damage, since those who own land have an exclusive right to its use; but an act that interferes with use but is not in itself a use is not actionable without damage. The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;

"(4) The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land. This does not mean that the defendant's conduct must be unreasonable. It only means that the interference must be unreasonable and this requires elaboration."

There is no evidence in this case that Amoco intended for natural gas to leak from its wells into the aquifer and eventually into appellees' irrigation water. Nor is there any evidence that Amoco intended this condition to continue once discovered. Accordingly, one of the elements necessary to recover on a nuisance theory was not established. We hold the trial court did not err in failing to instruct on nuisance.

The judgment of the trial court is reversed and this case is remanded for a new trial on the theory of negligence with damages pertaining to Sections 29, 32, and 34 of the appellees' real estate.