Manuel ANDERSON, et al., Plaintiffs,

v.

**FARMLAND INDUSTRIES, INC., Defendant.**

Nos. 98–2499–JWL, 99–2337, 99–2546, 00–2198.

United States District Court, D. Kansas.

March 20, 2001.

Randall K. Rathbun, Charles C. Steincamp, Depew and Gillen, L.L.C., Wichita, KS, James B. McMath, Samuel E. Ledbetter, Hank Bates, McMath Vehik, Drummond, Harrison & Ledbetter, Little Rock, AR, for plaintiffs.

Terry W. Schackmann, Michael F. Saunders, Barry L. Pickens, Clayton L. Barker, Spencer, Fane, Britt &· Browne, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

These environmental lawsuits [1] arise out of the operation of a petroleum refinery in Coffeyville, Kansas. Plaintiffs, individuals residing near the refinery, have asserted numerous common law and statutory claims against Farmland Industries, Inc. (Farmland), the owner and operator of the refinery. Presently before the court is a motion filed by Farmland seeking summary judgment on Count I of plaintiffs' complaints-strict liability flowing from an abnormally dangerous activity (Doc. 130). For the reasons discussed below, Farmland's motion is granted and Count 1 is dismissed.

### I. Background

Since 1906, Farmland's Coffeyville refinery has been refining crude oil into petroleum products. As part of its routine operation, the refinery emits various sub-

---

1. The following four lawsuits, in which individual plaintiffs bring nearly identical claims against Farmland Industries, Inc., have been consolidated for pretrial proceedings: *Anderson, et al. v. Farmland Indus., Inc.*, No. 98–2499; *Berry, et al. v. Farmland Indus., Inc.*, No. 99–2337; *Green, et al. v. Farmland Indus., Inc.*, No. 99–2546; and *King, et al. v. Farmland Indus., Inc.*, No. 00–2198.

stances into the atmosphere, including Particulate Matter ($PM_{10}$), Sulfur Dioxide ($SO_2$), and Hydrogen Sulfide ($H_2S$). The refinery's emissions are governed by the Clean Air Act (CAA), and the Kansas Department of Health and the Environment (KDHE) maintains a monitoring station which records concentrations of emissions from the refinery.

Plaintiffs are primarily citizens of Coffeyville who live or own property to the south and west of the Farmland refinery. The prevailing winds blow emissions from the refinery towards their residences five to ten percent of the time. Plaintiffs express concern that the emissions smell bad and place them at a health risk, as it is undisputed that exposure to certain concentrations of $PM_{10}$, $SO_2$, and $H_2S$ can result in adverse health effects. In Count I of their complaints, plaintiffs allege that the "operation of a petroleum refinery ... constitutes an abnormally dangerous activity from which strict liability may flow."

Farmland has filed the instant motion, asserting that plaintiffs can offer no evidence to support their strict liability claim. Plaintiffs' response addresses both the merits of Farmland's motion and requests additional time to conduct discovery before responding further. The court is now prepared to rule.

## II. Plaintiffs' Request for an Extension of Time

■ As an initial matter, the court must address plaintiffs' request for an extension of time in which to respond to defendant's motion for summary judgment. Plaintiffs base their request on Fed.R.Civ.P. 56(f), which allows a court to stay or deny a summary judgment motion pending discov-

ery.[2] The protections of Rule 56(f) "can be applied only if a party satisfies certain requirements." *Price v. Western Res., Inc.*, 232 F.3d 779 (10th Cir.2000). "A prerequisite to granting relief ... is an affidavit furnished by the nonmovant ... explain[ing] why facts precluding summary judgment cannot be presented." *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir.1992). "This includes identifying the probable facts not available and what steps have been taken to obtain these facts." *Id.* The affidavit must also "state with specificity why extra time is needed and how the additional time and material will rebut the summary judgment motion." *International Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc.*, 52 F.3d 901, 905 (10th Cir.1995) (citing *Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1554 (10th Cir.1993)). Mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable is insufficient to invoke Rule 56(f). *Id.* (citing *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir.1986)).

■ While plaintiffs have submitted an affidavit in support of their request for a stay of Farmland's summary judgment motion, the court concludes that the affidavit fails to satisfy the above principles. First, the affiant asserts that additional time would enable plaintiffs' experts to analyze technical specifications of emission sources and weather data, "recently" obtained by plaintiffs, to create a model of the emission patterns from the refinery. The affiant, however, does not identify the probable relevant facts that would arise

---

**2.** Rule 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court

may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

from the emission pattern model, nor the steps that plaintiffs have taken to independently obtain the facts that would come from the model.[3] Perhaps more significantly, the affiant does not explain with specificity how such facts will rebut Farmland's argument that the operation of the refinery is not an abnormally dangerous activity.[4]

Second, the affiant avers that "it is apparent to plaintiffs and their experts that defendant's public reports concerning emissions are inaccurate ... [and] plaintiffs contemplate that it will be necessary to take a number of depositions ... to uncover the true extent of emissions ... [and] potential health effects." The affiant does not suggest why plaintiffs believe Farmland's public reports to be false, nor why plaintiffs have taken no action, either before filing suit[5] or in the two years following, to discover the "true extent of emissions."[6] Rule 56(f) relief cannot be granted to a party that has been dilatory in seeking discovery. *See Jensen,* 998 F.2d at 1554–55. Moreover, the affiant does not state with specificity how plaintiffs would use additional time to rebut the summary judgment motion. Rather the affiant simply propounds that plaintiffs "contemplate" taking depositions; the affidavit is silent as to whom plaintiffs would

depose and what steps plaintiffs have taken to arrange depositions.

Finally, the affiant makes the general statement that "plaintiffs will not have access to all documents relevant to ... the true nature of defendant's emissions and its ability to control those emissions through the exercise of ordinary care" until the court considers the merits of Farmland's privilege assertions. The Tenth Circuit has found such conclusory affidavit terms insufficient to support action under Rule 56(f). *See Jensen,* 998 F.2d at 1554. The affiant failed to identify any particular facts that plaintiffs believed would be discovered in the allegedly privileged documents. Nor did the affiant attempt to show how any facts gleaned from the documents would be useful in opposing Farmland's summary judgment motion.

It appears to the court that plaintiffs are attempting to use discovery as a fishing expedition to search for any possible evidence which would support their strict liability claim. Plaintiffs fail to identify specific facts that would defeat the instant summary judgment motion if given time to be discovered. Pursuant to the rule in the Tenth Circuit, the court declines to grant plaintiffs' request for a Rule 56(f) extension of time. *See Price,* 232 F.3d at 784 ("If all one had to do to obtain a grant of a

---

3. The affiant states that "plaintiffs have been frustrated in their discovery efforts by a combination of stays issued by the Court, fruitless settlement efforts, and a systematic application of obstructive discovery tactics employed by the defendant." This "explanation," however, does not constitute a showing that plaintiffs took steps to obtain the facts that they seek. Moreover, the court notes that, although discovery was limited to standing issues from March 22, 1999 to May 21, 1999, and stayed from December 8, 1999 to June 23, 2000, plaintiffs have had ample time to gather information in this case in order to comply with the requirements of Rule 56(f).

4. For example, the affiant does not assert what conclusions a reasonable trier of fact could reach if the emission patterns reveal the presence of air toxins above a certain level.

5. By signing the complaint, plaintiffs' attorney represented to the court that plaintiffs' strict liability claim had "evidentiary support," as plaintiffs' attorney did not condition this claim on the opportunity for further discovery. See Fed.R.Civ.P. 11(b)(3).

6. The affidavit states that Farmland has "dodged plaintiffs' request" to make certain documents available, but does not delineate the steps taken by plaintiffs to enforce their discovery requests.

Rule 56(f) motion were to allege possession by movant of certain information and other evidence, every summary judgment decision would have to be delayed while the non-movant goes fishing in the movant's files.") (internal citations omitted). Thus, the court is now prepared to rule on Farmland's motion for summary judgment.[7]

### III. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the

ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *See Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### IV. Discussion

 Farmland seeks summary judgment on plaintiffs' claim in Count I of their

---

7. Plaintiffs did not request the opportunity to supplement their response to Farmland's motion for summary judgment in the event that the court denied their Rule 56(f) request for an extension of time. Even if plaintiffs had so requested, the court would neither be inclined, nor obligated, to grant the request. *See Campbell,* 962 F.2d at 1522–23 (holding that district court was not required to honor

plaintiffs' request that the district court notify them prior to ruling on the summary judgment motion, if it was inclined to deny their Rule 56(f) motion); *Schaffrath v. Thomas,* No. 98–4030, 1999 WL 644806, at *1 (10th Cir. Aug.25, 1999) (district court denied plaintiffs' Rule 56(f) motion and granted summary judgment in favor of defendants on the same day-affirmed).

complaints-that Farmland was engaging in an abnormally dangerous activity when it operated the Coffeyville refinery. When the relevant facts are undisputed, whether or not an activity is abnormally dangerous is a question of law to be determined by the court. *See Koger v. Ferrin,* 23 Kan. App.2d 47, 51, 926 P.2d 680, 684 (1996); *Trinity Universal Ins. Co. v. Snell,* No. 94–1216, 1997 WL 557331, at *2 (D.Kan. July 16, 1997). The court concludes that plaintiffs have presented no evidence of facts which could convince a reasonable juror that the operation of the Farmland refinery was an abnormally dangerous activity. Farmland's summary judgment motion is granted. *See, e.g., Ballard v. Buckley Powder Co.,* 60 F.Supp.2d 1180, 1189 (D.Kan.1999) (granting summary judgment where "the plaintiff has failed to cite any evidence establishing the factors necessary to support" a strict liability claim).

The doctrine of strict liability for abnormally dangerous activities is derived from the English case of *Rylands v. Fletcher,* L.R. 3 H.L. 330 (1868), and was first recognized in Kansas in 1917. *See Helms v. Eastern Kansas Oil Co.,* 102 Kan. 164, 169 P. 208 (1917). For nearly 70 years, Kansas courts applied the *Rylands* doctrine in numerous cases, until the Kansas Supreme Court case of *Williams v. Amoco Produc-*

*tion Company,* 241 Kan. 102, 734 P.2d 1113 (1987). In *Williams,* the Court acknowledged its previous application of the *Rylands* doctrine, but went on to adopt sections 519 and 520 of the Restatement (Second) of Torts as the proper analysis of claims involving abnormally dangerous activities.[8] *Id.* at 115, 734 P.2d 1113. *See also Falls v. Scott,* 249 Kan. 54, 60, 815 P.2d 1104, 1110 (1991) (reaffirming adoption of §§ 519 and 520 of the Restatement (Second) of Torts for determining whether an activity is abnormally dangerous).

Section 519 of the Restatement (Second) of Torts sets forth the general rule regarding strict liability in tort for abnormally dangerous activities as follows:

(1) one who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 of the Restatement (Second) of Torts then sets out the following six factors for courts to consider in determining whether an activity is abnormally dangerous:

---

8. Plaintiffs argue that under the *Rylands* doctrine, as applied in pre-*Williams* cases, Farmland's strict liability could be premised on Farmland's maintenance of a nuisance, in addition to Farmland's performance of an abnormally dangerous activity. This argument appears irrelevant, however, as Farmland's current motion seeks summary judgment only on Count I of plaintiffs' complaints-strict liability for the operation of "an abnormally dangerous activity." Farmland addresses plaintiffs' claims of nuisance, found in Count II of plaintiffs' complaints, in another motion. At this time, therefore, the court simply notes that the theory that a strict liability claim exists under *Rylands* apart from

sections 519 and 520 of the Restatement has previously been rejected by this court. *See Greene v. Product Mfg. Corp.,* 842 F.Supp. 1321 (D.Kan.1993). In *Greene,* the plaintiffs asserted that "Kansas recognizes two forms of strict liability that have their genesis in *Rylands v. Fletcher* [;] ... the first form covers liability for abnormally dangerous activities and the second form exists when a defendant brings a harmful substance onto its property and allows it to escape." *Id.* at 1326. The court disagreed, however, and held that, pursuant to *Williams,* "the *Rylands v. Fletcher* doctrine and the strict liability doctrine under the Restatement are not separate and distinct theories of recovery." *Id.*

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on;

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Comment f of Section 520 explains that the factors are interrelated, none being dispositive. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even . . . without the need of a finding of negligence." *Id.* Applying the Section 520 factors, the court finds that plaintiffs fail to demonstrate that Farmland's operation of the Coffeyville refinery constitutes an abnormally unusual risk of harm.

Factors (a) and (b) require the court to consider whether there is a "high degree" of risk that "some" harm will come to the person, land or chattels of others from Farmland's operation of the refinery, and whether that harm will be "great." Plaintiffs allege that substances emitted from the refinery pose health risks to individuals who breathe the air near plaintiffs' residences. The KDHE monitoring station near the refinery records the concentration of $PM_{10}$, $SO_2$, and $H_2S$ in the air, and the parties rely on this data as an indicator of the amount of these substances released by the refinery.[9] The

Environmental Protection Agency (EPA) has established National Ambient Air Quality Standards (NAAQS) for pollutants considered harmful to public health and the environment. Exposure to substances at concentrations above their NAAQSs could lead to health problems. The NAAQS for $PM_{10}$ is set at a 24 hour average level of 150 ug/m$^3$. The NAAQS for $SO_2$ is set at a 3 hour average level of .5 parts per million (ppm). And although the EPA has set no NAAQS for $H_2S$, the Agency for Toxic Substances and Disease Control (ATSDR) sets the minimum risk level (MRL) at .07 ppm.

After reviewing the evidence before it in the light most favorable to plaintiffs as the nonmoving party, the court concludes that plaintiffs have shown that "some" harm could result from the refinery's emission of $H_2S$ and $SO_2$, but plaintiffs fail to show that there is a high degree of risk of this harm or that the harm will be great. First, plaintiffs submit evidence that the level of $H_2S$, when recorded in 5 minute increments by the KDHE air monitor, exceeded the minimum health risk threshold established by the ATSDR on 199 occasions. This evidence clearly demonstrates that some harm could result from the refinery's release of $H_2S$. However, plaintiffs have failed to show that 199 occasions constitutes a "high degree of risk" as compared to the total number of 5 minute increments recorded. Moreover, plaintiffs present no evidence that the harm that could result from the $H_2S$ in the atmosphere is "great." In fact, the only evidence on the record which discusses the health risks of $H_2S$ inhalation indicates that, even at levels as high as 50–200 ppm, the health risks are relatively minor-eye

---

9. Although plaintiffs repeatedly denounce the value of the data derived from the KDHE air monitoring station, noting that the station's limit of the types of substances monitored and the station's single location shroud the full picture of the refinery's emissions, plaintiffs offer no other evidence from which a clearer picture can be derived.

irritation, sore throat, cough, and shortness of breath. Second, although the level of $SO_2$ has never exceeded the .5 ppm NAAQS level established for a 3 hour average,[10] plaintiffs have cited evidence which demonstrates that asthmatic individuals are nonetheless placed at risk from the refinery's emission of the chemical.[11] Sensitive asthmatics exposed to $SO_2$ concentrations higher than .1 ppm could experience bronchoconstriction, or "asthma attacks." $SO_2$ concentrations exceeded .1 ppm on approximately 2.5% of the days recorded and on approximately .4% of the hours recorded. While this evidence indicates that operation of the refinery presents some harm to asthmatic individuals, it does not indicate that the risk of harm is high, nor that the potential harm is great. *See Louderback v. Orkin Exterminating Co., Inc.*, 26 F.Supp.2d 1298, 1309 (D.Kan. 1998) ("Most activities considered abnormally dangerous carry a serious risk of *life-threatening* harm that cannot be eliminated through the exercise of reasonable care.") (emphasis added). Finally, the court notes that plaintiffs have presented no evidence that the Farmland refinery has ever released $PM_{10}$[12] in a concentration greater than the 24 hour NAAQS of 150 ug/m$^3$; the evidence before the court indicates that the highest level recorded at the KDHE monitoring station for the 24 hour average level of $PM_{10}$ was 124 ug/m$^3$.

Perhaps even more significant than the first two factors is factor (c)-whether or not the risk of harm could be eliminated by the exercise of reasonable care. *See Erbrich v. Wills*, 509 N.E.2d 850, 857 (Ind. App. 1st Dist.1987) (concept of factor (c)

"is at the core of § 519 liability"); *Chaveriat v. Williams Pipe Line Co.*, No. 94–C–0750, 1994 WL 583598, at *5 (N.D.Ill. Oct.18, 1994) ("the third factor ... merits primary attention"). While the refinery cannot operate without producing emissions, the court concludes from the evidence before it that the exercise of reasonable care could keep emissions within recognized safety criteria. *See, e.g., Ballard v. Buckley Powder Co.*, 60 F.Supp.2d 1180, 1189 (D.Kan.1999) (granting defendants summary judgment where evidence indicated that reasonable care could control vibrations from blasting and keep them within recognized safety criteria); *New Meadows Holding Co. v. Washington Water Power Co.*, 102 Wash.2d 495, 687 P.2d 212, 216 (1984) ("Some degree of risk of natural pipeline leaks will always be present[;][t]his does not mean, however, that the 'high degree of risk' with which section 520 is concerned cannot be eliminated by the use of reasonable care...."). Plaintiffs present no evidence that the risk of health hazards from the refinery's operation cannot be eliminated by Farmland's use of reasonable care. To the contrary, plaintiffs' evidence implicitly supports the opposite conclusion. Plaintiffs have submitted the affidavit of Roger Goenner, a former superintendent from the Coffeyville refinery, who testified as follows:

> Malfunctions and process upsets that result in excess emissions are not routine or inevitable. Excess emissions can be, and should be, prevented.... [A] refinery with proper operator training, a good preventive maintenance program

---

**10.** Plaintiffs speculate that if the concentration of $SO_2$ were monitored in 5 minute, rather than 3 hour, increments, the number of recorded times that the $SO_2$ concentration exceeded safe levels would increase. The summary judgment standards discussed above, however, require plaintiffs to support their theories with evidence, not speculation.

**11.** Plaintiffs have not presented evidence that any of them are asthmatic.

**12.** Plaintiffs assert that $PM_{2.5}$ could also have adverse health effects, but plaintiffs present no evidence of the level, if any, of PM2.5 released by the refinery.

and management oversight can prevent excess emission events from occurring. Goenner Aff. at 2. The lack of evidence that the harm from the emissions cannot be eliminated, as well as the evidence that the magnitude of emissions can be reduced, convinces the court that this factor weighs in favor of Farmland.[13]

The remaining three Restatement factors examine the activity's relationship to the community. Plaintiffs do not address factors (d) through (f), other than to admit the facts presented by Farmland which speak to these factors. Factor (d) is the extent to which the activity is a "matter of common usage." Comment i of Section 520 states that an activity is a matter of common usage "if it is customarily carried on by the great mass of mankind or by many people in the community." Thus, the comment goes on to explain, blasting, oil drilling, and manufacturing explosives, while recognized as essential to the interests of the public, "are carried on by only a comparatively small number of persons and therefore are not matters of common usage." Although the court lacks the benefit of plaintiffs' argument on this factor, the court simply cannot find that operating a petroleum refinery is something carried on by a large mass of people. Although the product produced by the refinery is used commonly by a great number of people, the court finds this analogous to the oil drilling example discussed in Comment i.[14] The court finds this factor to weigh in plaintiffs' favor.

Factor (e) asks whether the activity is inappropriate to the place where it is carried on. Plaintiffs have produced no evidence indicating that the location of the refinery is inappropriate. Moreover, plaintiffs have not contested the facts presented by Farmland that the refinery is located in the center of an industrial complex, zoned for heavy industry, at the northeast outskirts of Coffeyville. A number of other industrial plants are located within a 1.5 mile radius of the refinery, including a sulfur recovery plant, an air separation unit, a nitrogen fertilizer plant, a concrete plant, and a paint manufacturing plant. Nothing convinces the court that the location of the refinery is inappropriate. *See Greene*, 842 F.Supp. 1321, 1327 (location of metal fabrication plant was appropriate where carried on in an industrial area of the city).

The final factor also weighs in Farmland's favor. Factor (f) directs the court to consider the extent to which the refinery's value to the community is outweighed by its dangerous attributes. As discussed above, plaintiffs have presented evidence that the refinery presents relatively minor health risks to individuals re-

---

13. Plaintiffs argue that Farmland's assertion of the "malfunction" or "upset" defense, in which Farmland contends that the excess emissions were beyond its control, is contrary to a finding that the risk of harm can be eliminated by the exercise of reasonable care. As to proving the applicability of the upset defense, the court has previously held that Farmland will have the burden at trial (Doc. 70). As to proving the nature of an abnormally dangerous activity, however, plaintiffs have the burden. The factors involved in proving each, while similar, are not exact. Focusing only on the issue at hand, the court finds that plaintiffs have failed on summary judgment to produce evidence which would support their theory of an abnormally dangerous activity.

14. The court finds unpersuasive the non-precedential cases cited by Farmland which hold that the carrying on of industrial activities are matters of common usage, *see Melso v. Sun Pipe Line Company*, 394 Pa.Super. 578, 576 A.2d 999, 1003 (1990) (finding the transmission of natural gas and petroleum products a matter of common usage) and *New Meadows*, 687 P.2d at 216 (finding the transmission of natural gas a matter of common usage), and chooses instead to follow the Restatement comment.

siding nearby. Plaintiffs have not argued, however, that this dangerous feature outweighs the value of the refinery to the Coffeyville community. Farmland has presented uncontroverted evidence that the Coffeyville refinery employs about 325 people and expends about $12.5 million each year for local utility services, local supplies, and local contract work. In addition, a local air separation plant and nitrogen fertilizer plant depend on the refinery for their operations and employ an additional workforce of approximately 100 people. Without any evidence to the contrary, the court finds that these benefits to the community are not outweighed by danger of the refinery.

Taken as a whole, the factors under Restatement Section 520 lead the court to conclude that the operation of the Coffeyville refinery is not an abnormally dangerous activity. The court does not believe that Kansas courts would adopt strict liability, rather than negligence, as the appropriate legal regime for damages in this case.[15] While the court is mindful that some degree of risk will always be present in the operation of a petroleum refinery, "[a]n activity is not abnormally dangerous simply because it may *possibly* produce injury." *Ludwikoski v. Kurotsu,* 840 F.Supp. 826, 829 (D.Kan.1993) (*citing Falls,* 249 Kan. at 60, 815 P.2d at 1110). *See also, Chaveriat,* 1994 WL 583598 at *6 ("The inevitability of some harm does not imply that reasonable care cannot erase the high risk of great harm that triggers strict liability under § 520.").

**IT IS ACCORDINGLY ORDERED** that Farmland's motion for summary judgment on Count I of plaintiffs' complaints (Doc. 130) is granted.

**IT IS SO ORDERED.**

---

**15.** Kansas courts have traditionally defined "abnormally dangerous activities" very narrowly. *See, e.g., Williams,* 241 Kan. at 115, 734 P.2d at 1123 (drilling and operation of natural gas well was not abnormally dangerous activity for purposes of determining whether to impose strict liability on gas company); *Balagna v. Shawnee County,* 233 Kan. 1068, 1082, 668 P.2d 157, 168 (1983) (trench-ing work was not an inherently dangerous activity); *John T. Arnold Assocs. Inc. v. City of Wichita,* 5 Kan.App.2d 301, 317, 615 P.2d 814 (1980) (city's maintenance of water main was not an abnormally dangerous activity). *But see Laterra v. Treaster,* 17 Kan.App.2d 714, 844 P.2d 724, 731 (1992) (use of automobile to commit suicide by carbon monoxide poisoning was abnormally dangerous activity).