(926 P.2d 680)
No. 74,094

EDWARD KOGER, SUSAN KOGER, and ROBERT LAMBERT, *Appellants*, v. DELMER "BUCK" FERRIN and DAN FERRIN, d/b/a FERRIN & SONS, and KANSAS SEVEN-S CORPORATION, *Appellees*.

CENTRAL KANSAS RAILWAY, L.L.C., *Appellant*, v. DELMER "BUCK" FERRIN and DAN FERRIN, d/b/a FERRIN & SONS, and KANSAS SEVEN-S CORPORATION, *Appellees*.

Opinion filed November 15, 1996.

*Robert Martin* and *Roger E. McClellan*, of Martin, Pringle, Oliver, Wallace & Swartz, L.L.P., of Wichita, and *Robert W. Christensen*, of Christensen, Johnston & Eisenhauer, of Medicine Lodge, for appellants Edward Koger, Susan Koger, Ronald Lambert, and Central Kansas Railway, L.L.C.

*Stephen M. Kerwick* and *David J. Rebein*, of Foulston & Siefkin, L.L.P., of Dodge City, and *Richard N. Raleigh*, of Medicine Lodge, for appellees Ferrin.

*Norman R. Kelly* and *Robert A. Martin*, of Norton, Wasserman, Jones & Kelly, of Salina, and *Stephen W. Brown*, of Megaffin, Brown & McCall, of Pratt, for appellee Seven-S Corporation.

Before MARQUARDT, P.J., RULON, J., and PHILIP C. VIEUX, District Judge, assigned.

RULON, J.: Edward Koger, Susan Koger, Ronald Lambert, and Central Kansas Railway, L.L.C., plaintiffs, appeal the district court's decision granting a motion for directed verdict in favor of defendants Delmer "Buck" Ferrin and Dan Ferrin, d/b/a Ferrin & Sons, and Kansas Seven-S Corporation on plaintiffs' claim that defendants were strictly liable for damages resulting from a grass fire. We affirm.

Essentially, plaintiffs contend the district court erred (1) in granting defendants' motion for a directed verdict on the issue of strict liability and (2) in finding defendants were not engaged in a joint venture.

The facts are not seriously disputed and are as follows:

On the morning of April 7, 1994, Dan Ferrin and Alan Seidel were putting out hay and cattle feed in pastures owned by the Kansas Seven-S Corporation and operated by Buck Ferrin. As Seidel was dispensing hay in what was known as the Kominska pasture, he saw smoke rising from a smoldering patch of grass. After dropping off all of the hay, Seidel drove over to the area where he had seen the smoke and proceeded to put out the fire. Seidel testified that he kicked the smoldering debris to the middle of the burning

patch and kicked or pushed loose dirt over the debris. Seidel stated that he remained for about 15 minutes and after seeing no more smoke, left the area to complete his work. As Seidel was driving home after completing his deliveries, he looked over toward the place he had found the fire and, observing no sign of smoke, continued home.

Shortly after noon on that same day, Buck Ferrin received a call from a neighboring rancher who said he had seen smoke coming from the Kaminska pasture. After looking out his door and seeing smoke coming from the pasture, Ferrin called the fire department. Ferrin then drove to Seidel's house and told him about the fire. Seidel took a water truck, drove to the pasture, and started fighting the fire. Seidel was unable to control the fire, and by the time the fire department arrived, it was out of control. The fire eventually spread to the Koger ranch. Before being brought under control, the fire burned an area approximately 23 miles long and 7 miles wide, in all approximately 30,000 acres. The fire destroyed pasture, fence, baled hay, railroad ties, and bridges. The extent of the fire and severity of the damage was caused by the extreme dry conditions and high winds.

Plaintiffs subsequently filed suit, in part alleging that defendants were strictly liable for the damage because defendants' employee had failed to take adequate measures to ensure that the smoldering patch of burning hay was extinguished before leaving the pasture. Plaintiffs claim that because of the drought conditions, the existence of a state-wide burning ban, and the high winds, defendants were strictly liable, without proof of fault, for the damage caused by the fire. Plaintiffs further claim that defendants were liable for negligently starting or permitting a fire to start in the pasture and to spread to the adjacent property.

At the close of plaintiffs' case, defendants moved for directed verdict on the claim of strict liability. The district court granted the motion. The trial continued on the negligence claim. At the close of all the evidence, the defendant, Kansas Seven-S Corporation, moved for a directed verdict on plaintiffs' claim that it was a joint venturer in the Ferrins' operation versus a lessor of the lands operated by the Ferrins. The court granted the motion. The jury

subsequently found that while Seidel was negligent, his negligence was not the proximate cause of the damage. Additional facts will be added elsewhere as needed.

## STRICT LIABILITY

Our standard of review is clear:

" 'In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict.' " [Citation omitted.] *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 683, 829 P.2d 884 (1992).

"When appellate review is sought on a motion for directed verdict, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where reasonable minds could reach different conclusions based on the evidence the trial court's denial of the motion must be affirmed." *Kuhl v. Atchison, Topeka & Santa Fe Rwy. Co.*, 250 Kan. 332, Syl. ¶ 1, 827 P.2d 1 (1992).

"Strict liability means liability imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care (*i.e.*, actionable negligence)."

"The general rule imposing strict liability in tort for abnormally dangerous activities as set forth in the Restatement (Second) of Torts § 519 (1976) is stated and adopted: (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he [or she] has exercised the utmost care to prevent the harm; and (2) this strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous." *Williams v. Amoco Production Co.*, 241 Kan. 102, Syl. ¶¶ 7, 8, 734 P.2d 1113 (1987).

"When the facts are undisputed, whether an activity is inherently or intrinsically dangerous is a question of law to be decided by the court. When ruling on a motion for summary judgment involving this question, the trial court as a matter of law must determine from the undisputed facts contained in the record whether the activity under review is inherently dangerous. When the facts are disputed, the question is to be determined by the jury." *Falls v. Scott*, 249 Kan. 54, Syl. ¶ 3, 815 P.2d 1104 (1991).

As we understand, the crux of plaintiffs' argument is that because of the burning ban and the dry and windy conditions, putting out

the fire was an inherently dangerous activity and, therefore, defendants were strictly liable for any damage resulting from failing to take all means possible to extinguish the fire. Plaintiffs base this claim on the analysis originally set out in *Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868).

The *Rylands v. Fletcher* doctrine of strict liability was recognized in Kansas in *Helms v. Oil Co.*, 102 Kan. 164, 169, 169 Pac. 208 (1917). In *Rylands*, the water from the defendant's reservoir broke through a filled-up shaft of an abandoned coal mine and flooded a connecting mine owned by the plaintiff. The defendants were held liable because they had made a "non-natural use" of their land, which in turn brought an increase in risk to others. See *Williams*, 241 Kan. at 113.

Another case cited by plaintiffs is *Atkinson v. Herington Cattle Co, Inc.*, 200 Kan. 298, 436 P.2d 816 (1968). In *Atkinson*, the plaintiff owned a dairy farm adjacent to Herington's cattle feeding operation. A small stream ran from the Herington property through the Atkinson land. Approximately 18 months after Herington commenced a commercial feeding operation, Atkinson noted the water in the stream appeared polluted. Subsequently, it was determined the stream was polluted and the well on the Atkinson property was also polluted with high concentrates of nitrites. Atkinson sued claiming that Herington's cattle operation had caused the pollution.

In *Atkinson*, the trial court found that the pollution in the creek water and in Atkinson's well was caused by Herington's feedlot operation. On appeal, Herington argued the trial court erred in ruling that the right to recovery was based upon the defendant having a harmful substance on its land and allowing the pollutant to escape and damage an adjoining landowner's property. According to Herington, such a finding was tantamount to ruling that runoff from a cattle pen is a harmful substance per se. The *Atkinson* court disagreed, holding that runoff becomes a harmful substance when it consists of contaminating bacteria and chemical in such amounts as to produce excessive pollution, resulting in injury.

Plaintiffs argue *Atkinson* is directly applicable here because the fire, given the drought conditions, is like the runoff with high concentrations of pollution.

We conclude *Atkinson* is distinguishable. First, the pollution was the foreseeable result of concentrating a large number of cattle in a feeding operation. Second, the case was a water law case. Negligence is not a necessary element in a water law case. 200 Kan. at 302. *Atkinson* instructs that one who brings pollution, or a source of pollution, on his or her land has an absolute duty to see that such does not escape and damage another's property if the pollution contains contaminants in concentrations which could cause injury. 200 Kan. at 308.

Our Supreme Court has discussed *Rylands v. Fletcher* in several different cases. In *Klassen v. Creamery Co.*, 160 Kan. 697, 165 P.2d 601 (1946), the court held that waste discharged from a creamery was, under the facts of the case, dangerous and likely to cause damage if permitted to escape. "Under such circumstances it was the duty of the company to take care that these products did not escape or that they were so treated that when they left its property they had lost their capacity to do damage." 160 Kan. at 706.

We further conclude *Klassen* is also distinguishable. The creamery waste in question was of the defendant's making and was in essence the product of a "non-natural use" of defendant's property. Here, as stated above, the fire in question was not of defendants' making and, arguably, the attempt to put out that fire, under the circumstances, was not a "non-natural use" of the property.

Similarly, in *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 33 P.2d 953 (1934), our Supreme Court held that where a company drilling for oil brings salt water to the surface, that company has a duty to keep the salt water confined on its own property. If the salt water is allowed to escape and becomes a nuisance, the company is liable for any damage that may be caused. 140 Kan. 94, Syl. ¶ 1. The *Berry* court noted that in such a case negligence need not be shown because the right to recover results from the company bringing something to its land that was not naturally occurring and, the company was liable for any damages resulting from permitting the salt water to escape. 140 Kan. at 101.

*Berry* is distinguishable because the salt water, not naturally occurring on the surface of the land, was brought to the surface, and

the company was liable for damages resulting from its escape without having to prove negligence. Here, there was no evidence that defendants in any way brought or caused the fire to be on the property.

All of these cases cited by plaintiffs are of limited application under the current facts. First, each case is a water law case, and the legal precedent is limited to water cases under the absolute nuisance theory. See *Berry*, 140 Kan. at 102 ("We consider that the water supply of the people is of greater importance than the operation of a business at a reduced cost."); Prosser and Keeton on Torts, § 78, pp. 546-47 (5th ed. 1984). Second, plaintiffs are blending the law of inherently dangerous instrumentalities with inherently dangerous activities. Although the terms "dangerous instrumentality" and "inherently dangerous activity" are sometimes used interchangeably, there is a difference. *Falls v. Scott*, 249 Kan. at 58.

" 'To be inherently dangerous, a commodity or condition must be so imminently dangerous in kind as to imperil the life or limb of any person who uses it, or, burdened with a latent danger or dangers that derive from the very nature of the commodity or condition itself and not from any defect in the thing. " 'Inherently dangerous" has also been said to mean a type of danger inhering in an instrumentality or condition itself at all times, requiring special precautions to be taken to prevent injury, and not a danger arising from mere casual or collateral negligence of others under particular circumstances. Instrumentalities or substances which, by their very nature, are calculated to do injury are considered to be dangerous per se. An instrumentality is dangerous per se if it may inflict injury without the immediate application of human aid.' 57A Am. Jur. 2d, Negligence § 324." 249 Kan. at 58.

Whether an activity is abnormally or inherently dangerous is decided by the following factors:

"(a) existence of a high degree of risk of some harm to the person, land, or chattels of others;

"(b) likelihood that the harm that results from it will be great;

"(c) inability to eliminate the risk by the exercise of reasonable care;

"(d) extent to which the activity is not a matter of common usage;

"(e) inappropriateness of the activity to the place where it is carried on; and

"(f) extent to which its value to the community is outweighed by its dangerous attributes." 249 Kan. at 60 (quoting Restatement [Second] of Torts § 520 [1976]).

While salt water, sewage drain-off from cattle pens, or inadequately treated waste from a creamery may be dangerous or a nuisance under a given set of factual circumstances, such do not meet the definition of inherently dangerous instrumentalities. However, our Supreme Court has exempted such by-products from the traditional strict liability analysis, presumably because of the importance of clean, safe water. There is no indication that our Supreme Court has adopted a similar position regarding damage to property by fire.

Fires, either intentionally set or started by accident, are common occurrences in grasslands and, consequently, fighting such fires, when conditions warrant, would also be a common occurrence. Further, fighting such a fire under drought conditions is entirely appropriate. Similarly, attempting to control or extinguish an unplanned fire during drought conditions is of overwhelming value to the community and greatly outweighs the alternative course of action—not taking any action and letting the fire burn.

As we understand, most jurisdictions have consistently held that in the absence of statutory authority, there is no liability for escape of a fire when the defendant was not negligent.

"There may be liability for negligence in starting a fire, or in failing to take precautions against its occurrence, as where combustible materials are left unprotected, or in failing to control it after it is started, or neglecting to have the means to extinguish it at hand. But its utility is so great, and it is so clearly sanctioned by universal use, that strict liability, even on the part of industrial enterprises, is not considered convenient or desirable." Prosser and Keeton on Torts, § 77, pp. 543-44 (5th ed. 1984).

"It has been intimated that, at common law, one using fire for his own purposes was absolutely liable for damage caused by its spread to the property of another. However, it is now universally recognized that the foundation of liability for damage caused by the escape of fire, aside from any absolute liability created by statute, is negligence, and that one is not liable for damage caused by the dispersion of fire without proof of negligence in controlling or otherwise permitting the escape of the fire." 35 Am. Jur. 2d, Fires § 22, p. 602.

Plaintiffs admit there is no direct evidence as to the origin of the fire which was first discovered by Seidel. Plaintiffs further admit that where an intentionally set fire escapes and damages another's property, the plaintiff must prove negligence in order to recover

damages. However, plaintiffs contend that discovering a burning patch of grass under the conditions then present, coupled with the burning ban, triggered strict liability. Plaintiffs cite no case precedent that the spread of a fire, not intentionally started, triggers strict liability.

Defendants argue that damages resulting from the spread of intentionally started grass fires have always been judged using the negligence standard in this state. Here, there is no dispute that defendants did not purposefully start the fire. Importantly, there was no evidence that defendants accidentally started the fire. If defendants neither purposefully started the fire nor did anything which would start the fire, *Rylands v. Fletcher* does not control. Unquestionably, defendants did not bring a non-natural use of any kind to their property and, consequently, *Rylands* does not apply.

In Kansas, farmers and ranchers have a right to set controlled fires on their property for agricultural purposes and will not be liable for damages resulting if the fire is set and managed with ordinary care and prudence, depending on the conditions present. *Johnson v. Veneman*, 75 Kan. 278, Syl. ¶¶ 1, 2, 89 Pac. 677 (1907). There is no compelling argument for imposing strict liability on a property owner for failing to prevent the spread of a fire that did not originate with that owner or operator. Because the essential facts of this case are undisputed, as a matter of law, the doctrine of strict liability is not applicable under the facts presented.

## JOINT VENTURE

Based upon our above discussion, we need not reach the claimed error in the court's finding that defendants were not operating as a joint venture.

Affirmed.