No. 101,183

City of Neodesha, Kansas, *et al., Appellees,* v. BP Cor-
poration North America Inc., BP America Inc., BP
Products North America Inc., Atlantic Richfield Co.,
and BP America Production Co., *Appellants.*

(287 P.3d 214)

Opinion filed August 31, 2012.

*Richard C. Godfrey,* of Kirkland & Ellis LLP, of Chicago, Illinois, argued the cause, and *Andrew B. Bloomer, Catherine L. Fitzpatrick, Michael Chu,* and *Elizabeth J. Kappakas,* of the same firm, and *Richard C. Hite, Arthur S. Chalmers* and *F. James Robinson, Jr.,* of Hite, Fanning & Honeyman, L.L.P., of Wichita, were with him on the briefs for appellants.

*Daniel R. Young,* of Edgar Law Firm LLC, of Kansas City, Missouri, argued the cause, and *John M. Edgar, John F. Edgar,* and *David W. Edgar,* of the same firm, and *James P. Frickleton,* of Bartimus, Frickleton, Robertson & Gorny, P.C., of Leawood, were with him on the brief for appellees.

The opinion of the court was delivered by

BILES, J.: All persons and entities owning real property in and around the City of Neodesha, Kansas, brought a class action against the owners of a former oil refinery, alleging groundwater and subsurface soil contamination caused by the now dismantled facility. A jury found in the defendants' favor after a 17-week trial. But in posttrial proceedings, the district court decided it had made a mistake in submitting the strict liability claim to the jury, and it granted the plaintiff class judgment as a matter of law on its strict liability claim, setting the stage for a new trial over damages. BP filed this interlocutory appeal for relief from the order granting judgment on the strict liability claim and the conditional order for new trial.

The parties dispute whether the abnormally dangerous activities test generally used in tort law to impose strict liability is applicable when the claim relates to water contamination. The district court concluded it does not because "Kansas law provides that strict liability applies to conduct involving contamination of water resources, because of the importance of clean, safe water." And even if the abnormally dangerous activities test applied, the court held BP's "remediation" activities were abnormally dangerous as a matter of law.

We hold that the district court should not have granted the class judgment as a matter of law. The abnormally dangerous activities tests under the Restatement of Laws were the appropriate standards to apply to the plaintiff class' claims, and the jury decided the question. We reverse the district court's entry of judgment for the class on its strict liability claim, and we remand this matter to the district court with directions that the jury's verdict be reinstated and final judgment entered for the defendants.

## FACTUAL AND PROCEDURAL BACKGROUND

Between 1897 and 1970, Standard Oil Company and its corporate successors, BP Corporation North America, Inc.; BP America, Inc.; BP Products North America, Inc.; Atlantic Richfield Co.; and BP America Production Co. (collectively BP), owned and operated an oil refinery near Neodesha. During that time, the refinery generated wastes and by-products, including chemicals and metals

such as benzene, toluene, ethyl benzene, xylenes, polyaromatic hy-
drocarbons, arsenic, chromium, lead, and mercury. BP "has ac-
knowledged its responsibility to address residual petroleum prod-
ucts attributable to the refinery's operations" but it has denied
liability in this litigation.

While the refinery was operational, the locations of its activities
included: (1) the north site sludge pond, which was used for waste
disposal; (2) the south site settling basins; (3) the "Tank Site" con-
taining storage tanks and a pumping station; (4) an "Oil Separator
Pond Site" that received storm water and captured oil from refin-
ery drains; and (5) an industrial site that housed the refinery's
buildings. BP also admits petroleum products leaked or spilled
onto the ground while the refinery operated, but it claims most
refinery-related petroleum products that seeped into the ground
and later spread beyond the former refinery property are attrib-
utable to an accident in the 1960's when lightning struck a storage
tank and caused an explosion and fire. The class disputes this. Both
the north and south sites are now considered "closed," meaning
no more remediation activities are planned and site monitoring will
cease or has already ceased.

After the refinery finished operations in 1970, BP donated most
of the property to the City through a quitclaim deed, which stated
the conveyance was "as is" and acknowledged the refinery and
surrounding property were used for gasoline production and stor-
age. Most of the grounds are still owned by the City, with portions
reused for industrial development, while other areas are main-
tained as waste disposal sites or are vacant and unused. The City
turned part of the site into an industrial park where class members
Neodesha Plastics and Fiberglass Engineering leased facilities.

In 1980, BP met with the Neodesha mayor regarding city con-
cerns after a welding spark ignited petroleum waste products that
had seeped into a subsurface structure that was part of the City's
water treatment facility, causing a fire. The City also expressed
apprehension about an oily waste disposal pond and numerous sites
of buried waste. BP subsequently began study and remediation
activities. In 1981, BP installed 17 monitoring wells. In 1983, BP
installed another 13 monitoring wells and "capped" the north site

sludge pond with 2 feet of clay. In 1984, BP began a semi-annual well sampling program. And in 1985, BP consolidated, capped, and installed a gas venting system in the south site settling basins.

In 1990, BP entered into a consent agreement with the Kansas Department of Health and Environment (KDHE), the state agency with jurisdiction over hazardous substance cleanups, in which BP agreed to undertake specific investigative, monitoring, and corrective actions. The consent agreement identifies four classes of priority pollutants and notes that one of those pollutants, benzene, was detected in groundwater samples. In 1991, BP began a remedial investigation to determine the presence and extent of groundwater contamination, which included installation of 31 additional monitoring wells. In 2000, BP installed a phase I air sparging trench along the eastern and southern boundaries of the former tank site. It also removed 325 cubic yards of asphalt-like material from areas near the city ballpark. In 2002, BP implemented a phase II air sparging system that involved extraction wells to remove oil or light nonaqueous phase liquids (LNAPL) (refers to petroleum hydro carbon in its oil phase) from the groundwater. In 2003, 215 cubic yards of asphalt-like material were removed from the industrial site. According to a BP study, these activities removed 30,177 gallons of hydrocarbons, and benzene concentrations at some monitoring wells declined. BP cites this as evidence that its remediation activities successfully reduced contamination. The class disputed the effectiveness of those remediation efforts.

As a part of its case against BP, the class hired a hydrogeologist, Daniel B. Stephens, to review BP monitoring site data, conduct field investigations, and make recommendations regarding further clean-up and remediation activities for the contamination. In his report, Stephens concluded: (1) BP misrepresented and omitted information regarding historical operations and contamination sources; (2) BP presented biased environmental data that minimized the contamination and area that overlies the groundwater contamination; (3) groundwater arsenic concentrations exceeded drinking water standards and arsenic was more likely than not reaching the Fall and perhaps Verdigris Rivers; (4) groundwater contamination was migrating away from the refinery in multiple

directions, continually expanding the polluted areas; (5) distal dissolved contaminants that migrated in groundwater into the residential neighborhoods had not been contained; and (6) BP failed to consider commonly accepted and effective remedial alternatives in developing its corrective action study.

Stephens testified at trial how spilled oil reaches groundwater by moving through air-filled pore spaces in the soil, pushing the air out, and moving downward until it reaches groundwater. Once there, he explained, it tends to spread and float on the water table surface, eventually dissolving the pollutant chemicals in the oil into the water. The groundwater then spreads, carrying the contaminants. He further testified that these characteristics allow benzene to move easily through groundwater.

Regarding remedial activities, Stephens testified that although BP employed industry-recognized technologies, they were either implemented on too small a scale or used instead of a more expensive approach that would have been more effective. For example, Stephens described the "capping" of the north and south sites simply as waste entombment, meaning BP covered it up with the intent of leaving it in place. Stephens' opinion was that the better approach would have been to dig out the contaminants and haul them to a hazardous waste site in a more remote area because those sites use ground liners to prevent migration and monitors to ensure the waste remains stable. Stephens also testified that the pump-and-treat system used by BP in the trench was implemented on too small a scale to remediate the entire site. And Stephens testified BP had been injecting sulfate into the groundwater to reduce benzene concentrations, but other chemicals and processes are more effective and would have reduced the contamination more quickly. Regarding the air sparging system, Stephens testified this technology was implemented prematurely because BP had not removed the oil or LNAPL first. Finally, Stephens testified BP was not monitoring all areas where the waste was likely to spread and had misrepresented that the contamination plume was stable.

*The Court Proceedings*

In March 2004, the City, individually and as class representative, filed this class action. In September 2006, the district court granted

the plaintiffs' motion for class certification. The class is defined as "[a]ll persons and entities who owned real property on or after March 19, 2004, which has been exposed to or otherwise suffered economic harm from the hazardous wastes released from the [BP] operations in and around Neodesha, Kansas." The class brought numerous claims against BP, including: negligence; strict liability; nuisance; trespass; violation of K.S.A. 65-6203 (liability for accidental release or discharge of materials detrimental to water or soil); unjust enrichment; fraudulent concealment/fraud by silence; breach of fiduciary duty; and breach of contract, and it sought declaratory judgment relief.

Only the strict liability claim is before this court. Initially, the class asserted strict liability because it alleged that BP: (1) "created, transported and stored the BP Contamination at the BP Facilities for its own business purposes"; (2) "allowed the escape and release of, and failed to confine, the BP Contamination from the BP Facilities;" and (3) committed "misconduct in the transportation, storage and treatment of the BP Contamination and its operation of the BP Facilities." The strict liability claim is founded in tort and does not assert any basis for liability under any statute.

Before trial, BP moved for summary judgment on the strict liability claim on two grounds. First, BP argued the 10-year statute of repose under K.S.A. 60-513(b) barred any strict liability claim arising from the refinery's operations or resulting contamination because it had expired on those activities long ago. Second, BP contended the 2-year statute of limitations from K.S.A. 60-513 barred any claim for damages accruing before May 19, 2002. The class disputed both claims. The class argued that it was challenging BP's *current conduct*, not activities barred by the statutes of repose or limitations, because BP had assumed " 'full responsibility' for the current management of the refinery wastes and [is] currently engaged in that activity." The class also argued that BP was estopped from asserting the statutes of limitations and repose defenses because it had assured the class it was protecting the community.

The district court granted BP partial summary judgment. The court held that the 10-year statute of repose under K.S.A. 60-

513(b) barred claims "relating to the discontinued refinery operations." But the court refused to grant summary judgment as to whether BP was strictly liable for its "management of the remediation project." The court did not articulate what activities constituted the "management" exposure for BP, nor did the court define what was encompassed by the "remediation project" at issue. The court also declined to grant summary judgment based on BP's statute of limitations defense, because questions of fact remained as to whether BP was estopped from asserting that defense "regarding any current conduct and injuries, but not for refinery operations."

With the surviving strict liability claims going forward, the parties disputed what analytical test applied to those claims. BP argued that this court had adopted the abnormally dangerous activities test from the Restatement (Second) of Torts § 520 (1976) for all strict liability claims in *Williams v. Amoco Production Co.*, 241 Kan. 102, 114-15, 734 P.2d 113 (1987), and that it controlled. As explained in the *Williams* case, an activity may be determined to be abnormally dangerous by considering the following factors: (1) existence of a high degree of risk of some harm to the person, land, or chattels of others; (2) likelihood that the harm that results from it will be great; (3) inability to eliminate the risk by the exercise of reasonable care; (4) extent to which the activity is not a matter of common usage; (5) inappropriateness of the activity to the place where it is carried on; and (6) extent to which its value to the community is outweighed by its dangerous attributes. 241 Kan. at 114 (reciting the Restatement [Second] of Torts § 520).

But the class argued that Kansas caselaw applied a special, much simpler, rule for water pollution that imposes strict liability for any activity causing contamination, regardless of whether the defendant engaged in an abnormally dangerous activity. For that proposition, the class relied on a Court of Appeals decision, *Koger v. Ferrin*, 23 Kan. App. 2d 47, 52-55, 926 P.2d 680 (1996). The *Koger* court, while considering liability for a prairie fire, commented in dicta that Kansas caselaw "exempted" water contamination claims from the traditional strict liability analysis adopted in *Williams* "because of the importance of clean, safe water." 23 Kan. App. 2d at

55. In denying BP summary judgment, the district court noted that it found *Koger* "instructive."

In August 2007, the 17-week trial began. At the close of BP's evidence in its defense, the class moved for a directed verdict on the strict liability claim, arguing again that groundwater pollution was a per se strict liability offense as a matter of law; that BP had admitted the groundwater was polluted, the pollution had spread, and the contamination area had grown; and that BP's experts conceded the groundwater became contaminated after the refinery closed. BP disputed this, arguing it admitted only that refinery operations contaminated the groundwater—not that its remediation activities had contributed to or failed to contain the contamination. The district court overruled the class' motion, so the strict liability claim was submitted to the jury.

Instruction 4 explained to the jury that the plaintiff class claimed that "it sustained damages stemming from *Defendants' failure to clean up* the refinery contamination in Neodesha" and then later advised the jury that the plaintiff class claimed "Defendants are strictly liable to the Plaintiff Class *for their clean up of the refinery contamination.*" (Emphasis added.) The instruction does not acknowledge or explain its internal inconsistency, *i.e.*, defendants' alleged "failure to clean up" the contamination and "their clean up" of contamination. Instruction 9 was entitled "Strict Liability Claim" and stated:

"A person who engages in an abnormally dangerous activity is strictly liable for harm to the property of another resulting from the activity, although that person exercised the utmost care to prevent the harm. *To establish liability based upon strict liability, the Plaintiff Class must prove Defendants' remediation constituted an 'abnormally dangerous activity' as it relates to the Class.*

"*Kansas law provides that strict liability applies to conduct involving contamination of water resources, because of the importance of clean, safe water.*

"In determining whether Defendants' remediation is an abnormally dangerous activity, the following factors are considered:

  "(1) Existence of a high degree of risk of some harm to the person, land or chattels of others from the activity;

  "(2) Likelihood that the harm that results from it will be great;

  "(3) Inability to eliminate the risk by the exercise of reasonable care;

  "(4) Extent to which the activity is not a matter of common usage;

  "(5) Inappropriateness of the activity to the place where it is carried on; and

"(6) Extent to which the value of the activity to the community is outweighed by any dangerous attributes.

"No single factor determines whether an activity is abnormally dangerous and you may assign whatever weight you decide is appropriate to each factor. In other words, the Plaintiff Class must prove that the remediation created a risk that was so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it even though it was carried on with all reasonable care.

"The Plaintiff Class must prove that class-wide, real property suffered physical injury as a result of Defendants' abnormally dangerous activity.

"The Plaintiff Class has the burden to prove strict liability by a preponderance of the evidence. You may not find that the Defendants are strictly liable for the operation of the former refinery." (Emphasis added.)

Nowhere within the jury instructions was the jury advised what conduct was claimed to constitute either the "clean up" or the "remediation" comprising the class' strict liability claim. But during closing arguments, class counsel characterized the strict liability claim as "the concept of it's there and it's yours, you are liable."

The jury returned a defense verdict in BP's favor on all counts, including strict liability. The verdict form for the strict liability claim simply asked: "Do you find that the Defendants are liable to the Plaintiffs for strict liability?" After answering "[n]o," the jury was not required to address related questions pertaining to plaintiff subclasses, the tolling of the statute of limitations, or damages.

In posttrial proceedings, the class moved for a new trial pursuant to K.S.A. 60-259(a) and judgment as a matter of law pursuant to K.S.A. 60-250, raising numerous issues, including that the district court improperly instructed the jury on strict liability. As to that point, the class continued to argue that water contamination is a strict liability offense as a matter of law without application of the abnormally dangerous activity test and that the jury should not have been instructed to determine whether BP met that test's criteria. In an 85-page decision, the district court denied the class' motions on all grounds—except the strict liability claim. As to that, it granted judgment as a matter of law in favor of the plaintiff class, certified its ruling for interlocutory appeal, and "conditionally" granted a new trial for the calculation of damages.

The district court based its ruling on its posttrial determination, "after a vast amount of thought and research," that the jury instruction on the strict liability claim "was clearly erroneous under Kansas law." The district court held that our caselaw had "very carefully left strict liability for water pollution in place" as it existed before this court's 1987 decision in *Williams* adopting the abnormally dangerous activity test from the Restatement (Second) of Torts §§ 519 and 520 (1976). The district court relied on *Koger* for its decision, as well as a case from this court dealing with nuisance law, *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 915 P.2d 80 (1996). The district court then held: "Quite simply strict liability was not a question of fact but a question of law, and Plaintiffs were and are entitled to judgment as a matter of law. The jury never should have been instructed on strict liability, only the damages resulting therefrom."

As to its decision to "conditionally" grant the class a new trial on the damages claim if the entry of judgment in the class' favor was affirmed on interlocutory appeal, the district court simply explained:

"Plaintiffs have moved for judgment as a matter of law on the discrete issue of Defendants' strict liability for the spread of the pollution. Defendants have admitted to the existence of the pollution and their responsibility for the pollution. The only material issues of fact on Count II to be submitted to the jury concern whether Defendants were willful, wanton, fraudulent or malicious, and the damages as a result of the contamination. After possible Interlocutory Appellate Review pursuant to K.S.A. 60-2102(c) Count II should be set for re-trial in which the jury should be instructed that liability is no longer an issue in the case."

*Interlocutory Appeal*

BP filed a timely motion with the Court of Appeals seeking permission to pursue this interlocutory appeal, raising two issues: (1) whether the district court erred by granting judgment as a matter of law on the strict liability claim; and (2) whether the district court erred by conditionally granting a new trial. The class opposed the interlocutory appeal on both questions. As to the first, the class argued review did not satisfy the criteria for interlocutory appeal. On the second issue, the class argued it impermissibly extended

the scope of the question certified by the district court. The Court of Appeals granted the appeal on both.

This court transferred the case from the Court of Appeals on its own motion pursuant to K.S.A. 20-3018(c). In the meantime, the class filed a notice of cross-appeal that sought review of 19 other issues predominately unrelated to the strict liability determination. This court dismissed that cross-appeal. We also determined the class' challenge to BP's interlocutory appeal was jurisdictional in nature and allowed the parties to brief the jurisdictional question for oral argument and later determination as a part of our decision on the merits. We conduct that analysis next.

## ANALYSIS

*Is the Interlocutory Appeal Proper?*

The class argues the Court of Appeals erred by granting review of BP's interlocutory appeal.

### *Standard of Review*

This court reviews the decision to grant an interlocutory appeal for an abuse of discretion. *Williams v. Lawton*, 288 Kan. 768, 782, 207 P.3d 1027 (2009). Judicial discretion is abused if judicial action is: (1) arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. McCullough*, 293 Kan. 970, 980-81, 270 P.3d 1142 (2012).

### *Discussion*

The statute in force when BP sought its interlocutory appeal provided:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The court of appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within 10 days after the entry of the

order under such terms and conditions as the supreme court fixes by rule." K.S.A. 60-2102(c).

This statute requires that an interlocutory appeal must: (1) involve a controlling question of law; (2) relate to an issue on which there is a substantial ground for difference of opinion; (3) materially advance the litigation's ultimate termination; and (4) be timely filed. *Lawton*, 288 Kan. at 782.

In recognizing the legally debatable nature of its posttrial decision, the district court certified the following question for interlocutory appeal: "Did the trial court err in granting the Plaintiffs judgment, as a matter of law on their strict liability claim, after the jury's verdict for the Defendants?" But in granting the appeal, the Court of Appeals expanded its review at BP's request to consider whether the district court erred by: (1) granting judgment as a matter of law on the strict liability claim; and (2) conditionally granting a new trial. The class argues the first issue does not satisfy the criteria for an interlocutory appeal and the second issue impermissibly extends the issue certified by the district court. We consider both arguments next.

As to the first question, we find little basis for claiming that the specific issue certified by the district court is inappropriate for interlocutory appeal. It meets each of the criteria spelled out by statute and caselaw. It is purely a question of law, for instance, whether Kansas recognizes the strict liability test articulated in *Williams* in water contamination cases. And there appears to be at least some caselaw conflict, which would reflect a difference of opinion as to what is the controlling law. Compare *Williams* with *Koger*. Even the district court changed its mind on this same legal question during the proceedings.

And once that decision is put to rest, we would next determine whether the district court's grant of judgment as a matter of law was proper. As to this, the district court ruled there were no factual disputes, but BP argues the contrary and contends those factual disputes were resolved in its favor by the jury's verdict. Whether facts are in dispute and, if so, whether those facts were resolved by the jury are appropriate issues for interlocutory appeal under

the circumstances of this case. See *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 126, 815 P.2d 72 (1991) (question of law exists when no evidence is presented on an issue or when the evidence is undisputed and the minds of reasonable persons may not draw differing inferences or arrive at opposing conclusions).

If BP is correct and we hold that the district court was mistaken, it will materially advance the litigation's conclusion because the only remaining question will be the propriety of the conditional grant of a new trial. And if we decide that ruling was error or the issue is moot, the litigation will be reduced to final judgment in favor of defendants. The class seemingly concedes the first issue meets our criteria when it notes in its briefing that the district court's certified question is a pure legal issue that is "colorably proper" for interlocutory appeal.

We hold that the Court of Appeals did not abuse its discretion in granting review of BP's first issue because: (1) it involves a controlling question of law; (2) it relates to an issue on which there is ground for a substantial dispute; (3) deciding the question materially advances the litigation's termination because it will determine whether the case can reach final judgment; and (4) the class does not dispute that this appeal was timely filed.

We must next determine whether it is proper to review the trial court's conditional new trial order, which the Court of Appeals included in its order granting the appeal. This court recently decided a similar issue in another interlocutory appeal, which we find persuasive.

In *Lawton*, the district court granted a new trial after finding the defendant in a medical malpractice trial prejudiced when it was discovered the jury averaged each juror's negligence assessment and agreed to the resulting quotient as the verdict. The district court certified three issues for interlocutory appeal: (1) Was it error to admit the plaintiff's expert's testimony? (2) Was it error to *sua sponte* recall the jury? and (3) Did the judge commit error by questioning the jurors without allowing attorney participation? The Court of Appeals broadened the scope of those issues to include whether defense counsel committed error while interviewing ju-

rors and whether the trial court erred by granting a new trial. On appeal to this court, plaintiff argued the Court of Appeals exceeded its authority by expanding the interlocutory issues. We disagreed and held that a Kansas appellate court has pendent or supplemental interlocutory jurisdiction—if a certified issue is "inextricably intertwined" with other issues that do not meet K.S.A. 60-2102's criteria for an interlocutory appeal. 288 Kan. at 785-87. The obvious purpose of the exception, we held, is to allow meaningful review of the certified issue and promote judicial economy. With that as our test, we affirmed the inclusion of the other issues. 288 Kan. at 785-87.

In this case, BP argues the trial court lacked authority to enter a conditional new trial order when approving an interlocutory appeal. This is an issue requiring statutory interpretation, which is a question of law subject to unlimited review. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). Moreover, the second issue presented is inextricably intertwined with the issue certified by the district court because if the conditional order is left intact, it could potentially negate any ruling by this court that the district court's entry of judgment as a matter of law was improper. After all, if the trial court erred in ordering a new trial for any reason other than sufficiency of the evidence, a new trial is inappropriate. See K.S.A. 60-250(a).

We hold that the Court of Appeals properly exercised pendent jurisdiction to include the district court's conditional order for a new trial as part of this appeal. Turning now to the merits, we consider whether the trial court erred by granting judgment as a matter of law against BP on the strict liability claims.

*Was Judgment as a Matter of Law Appropriate?*

The threshold question in this case is whether the abnormally dangerous activity test applies to the strict liability claims in tort alleging water contamination. This is a question of law subject to unlimited review. See *Scott v. Hughes*, 294 Kan. 403, Syl. ¶ 4, 275 P.3d 890 (2012).

*Does the Abnormally Dangerous Activity Test Apply?*

The class argues that a defendant is per se liable for any water contamination. The district court ultimately accepted that argument in granting a judgment against BP after the jury returned a verdict in BP's favor. We disagree with the district court and hold that strict liability claims in tort alleging water contamination are governed by the abnormally dangerous activity test from the Restatement (Second) of Torts §§ 519 and 520. The development of our strict liability caselaw leads us quite naturally to this conclusion, despite some language to the contrary in *Koger*.

Kansas courts have recognized strict liability theory since the late 1800s. See, *e.g.*, *K. C. St. J. & C. B. Rld. Co. v. Simpson*, 30 Kan. 645, Syl. ¶ 1, 2 P. 821 (1883) (common carrier may contract away strict liability imposed by common law). And from that time forward, our court's analysis has kept pace with developments in this area of the law. Modern courts define strict liability as liability "imposed on an actor apart from either (1) an intent to interfere with a legally protected interest without a legal justification for doing so, or (2) a breach of a duty to exercise reasonable care (*i.e.*, actionable negligence)." *Williams v. Amoco Production Co.*, 241 Kan. 102, Syl. ¶ 7, 734 P.2d 1113 (1987).

In 1911, this court first considered strict liability in the context of polluted groundwater. In *Gilmore v. Salt Co.*, 84 Kan. 729, 115 P. 541 (1911), a landowner claimed damage to his land after piles of refuse salt deposited over several years on the defendant's land where mined rock salt had dissolved in the rain and was carried by percolation onto Gilmore's land, injuring vegetation and imparting a "saltish" taste to his spring water. The district court declared the case was not actionable, but this court disagreed. We held that "one has no right to deposit upon his land refuse matter of any sort, whether in itself offensive or not, by which the water underlying his neighbor's land may be so affected through percolation as to be unfitted for its ordinary use, or injurious to vegetation." 84 Kan. at 733. By this holding, our court signaled that the case turned on whether a landowner had a "right to cause the water under his neighbor's land to be impregnated with a harmful substance." 84

Kan. at 731. In other words, was there a right to pollute? We held that it was a "familiar doctrine that one must so use his property as not to injure his neighbor." 84 Kan. at 733. The case was remanded for a new trial, which ultimately ordered the defendant to cover the salt pile to prevent it from dissolving in the rain, and that remedy was deemed adequate on later appeal. *Gilmore v. Salt Co.*, 92 Kan. 18, 139 P. 1169 (1914).

Six years after the first *Gilmore* decision, in *Helms v. Oil Co.*, 102 Kan. 164, 169, 169 P. 208 (1917), a refinery pollution case, this court adopted the general principle of liability without fault articulated by Lord Blackburn of the House of Lords from the English case of *Fletcher v. Rylands* L.R. 1. Exch. 265 (1866), *aff'd Rylands v. Fletcher*, L.R. 3 H.L. 330 (1868). In *Rylands*, water from the defendants' man-made reservoir broke through the disused and filled-up shaft of an abandoned coal mine. The water flooded the connecting mine belonging to the plaintiff. The defendants were held liable on the theory that they had made a "nonnatural use" of their land, which created an increased danger to others. See *Pullen v. West*, 278 Kan. 183, 190, 92 P.3d 584 (2004) (describing *Rylands*). *Rylands* is widely considered to be among the first English common-law cases to hold that abnormally dangerous activities confer strict liability upon the actor. See Prosser and Keeton, Law of Torts § 78, at pp. 545-49 (5th ed. 1984) (discussing *Rylands* as the leading case from which the abnormally dangerous activity test developed).

In *Helms*, we addressed a nuisance action against a neighboring oil refinery in which the plaintiff alleged damages caused by oil and poisonous substances that flowed onto the neighboring land, damaging the land and injuring some cows. The defendant argued that it operated a lawful business and the plaintiff could not recover without first establishing negligence. Relying on the *Rylands* doctrine, the *Helms* court held the refinery was a nonnatural land use and that the refinery could not continue harming the plaintiff, even if the refinery business was lawful. The *Helms* court stated:

"The oil that was treated by the defendant at the refinery was obtained elsewhere, and its operations had no connection with the products of the land or the development of its natural resources. Taking the averments of the plaintiff, it is clear

that the quantity of oil, refuse, fumes, and gases that were thrown upon plaintiff's land constituted an unreasonable use and a nuisance. However useful and lawful the business in itself is, the defendant cannot be permitted to carry it on in such a way as to cause material injury to the plaintiff. *When the injurious substances were thrown upon plaintiff's land in the excessive quantities and in the manner set forth in plaintiff's petition, the defendant's use of its property became both unreasonable and unlawful.*" (Emphasis added.) 102 Kan. at 168-69.

The *Helms* court then cited as additional authority the first *Gilmore* decision and other earlier cases from Kansas and elsewhere that addressed various continuing land uses constituting nuisances to neighboring landowners through pollution of air and water. 102 Kan. at 169. And for nearly 70 years, Kansas courts applied the *Rylands* doctrine until *Williams* was decided in 1987.

In making its per se strict liability claim against BP, the class cites *Helms*, as well as a variety of pre-*Williams* decisions by this court: *Berry v. Shell Petroleum Co.*, 140 Kan. 94, 100, 33 P.2d 953 (1934) (oil company strictly liable for salt water escaping from refinery operation, citing *Rylands* and *Gilmore*); *Klassen v. Creamery Co.*, 160 Kan. 697, 706, 165 P.2d 601 (1946) (dairy farm strictly liable for pollution escaping into neighboring farm's stream and underground water supply, citing *Rylands*); and *Atkinson v. Herington Cattle Co., Inc.*, 200 Kan. 298, 307-08, 436 P.2d 816 (1986) (cattle feeder strictly liable for pollution of dairy farm's water supply, citing *Berry*). These post-*Helms* cases all involved water contamination and recognized that the strict liability theory being applied arose from *Rylands*. We would add to that list *Lee v. Mobil Oil Corporation*, 203 Kan. 72, 74, 452 P.2d 857 (1969) (when harm results from intervention of an unforeseeable force of nature, such as might happen with a flood, strict liability does not fall on the defendant.).

Each of these cases, of course, predates *Williams*, 241 Kan. 102, Syl. ¶¶ 8, 9, in which we adopted the abnormally dangerous activity doctrine from the Restatement (Second) of Torts §§ 519 and 520. But § 519, which articulates the test imposing strict liability for abnormally dangerous activities, is widely recognized as descending from *Rylands*. See Prosser and Keeton, Law of Torts § 78, at pp. 545-55; Shapo, *Responsibility for Injuries: Some Sketches*, 100 Nw.

U. L. Rev. 481, 486 (2006). So it is not entirely certain that the strict liability caselaw predating *Williams* treated water contamination differently as the class now argues and the district court held. The real question seems to be whether *Williams* meant to "exempt" the type of water contamination case we have here from the abnormally dangerous activity strict liability test it adopted, as argued by plaintiffs and suggested by the Court of Appeals in *Koger*.

In *Williams*, the plaintiff landowners claimed natural gas from defendants' gas wells entered their irrigation water derived primarily from the aquifers, slowing the pumping system and damaging their crops. The court specifically defined the issue regarding strict liability to be "whether strict liability applies to the escape of natural gas from Amoco's natural gas well into underground water formations and subsequently into [plaintiff landowners'] irrigation water." 241 Kan. at 112. And the *Williams* court acknowledged that the strict liability doctrine for abnormally dangerous activities derived from *Rylands*, which was initially adopted by this court in *Helms* and applied in *Atkinson*, *Klassen*, and *Berry*—all water contamination cases, as mentioned above. 241 Kan. at 113-14.

The *Williams* court chose to expressly adopt the abnormally dangerous activity doctrine articulated in §§ 519 and 520 of Restatement (Second) of Torts and "utilize its provisions *to aid* in determining whether natural gas is an abnormally dangerous substance under the circumstances of the case." (Emphasis added.) 241 Kan. at 115. And after applying those provisions, the court determined that drilling and natural gas well operation were not abnormally dangerous activities. In addition, the court held that the drilling and operation of natural gas wells was not a nonnatural use of the land, as discussed in the *Ryland* line of cases. 241 Kan. at 115.

Of importance to this case, *Williams* noted in its application of the abnormally dangerous activity doctrine from the Restatement §§ 519 and 520 the contrast the court saw between the escape of natural gas and *Berry*'s salt water contamination. 241 Kan. at 115-16. The *Williams* court stated:

"Unlike the salt water which escaped from the defendant's well in *Berry*, natural gas is not a 'harmful agent' once it is raised to the surface of the earth. Nor does

natural gas ruin drinking water, destroy vegetation, or injure livestock. Moreover, natural gas is not a substance which is known to be 'mischievous' if it gets on the property of others." 241 Kan. at 116.

This language may have been what led the *Koger* panel to perceive some intent to exclude water pollution from the scope of the Restatement's abnormally dangerous activity test. But when taken in context, the reference to *Berry* is plainly part of the *Williams* court's discussion of the Restatement's test as a means of describing circumstances that might be more likely to be considered an abnormally dangerous activity, in contrast to the natural gas well drilling and operation at issue in *Williams*. And because *Williams* did not explicitly define all instances in which the Restatement's test now governs strict liability in Kansas, it has been argued that Kansas continues to preserve other forms of strict liability. See *Koger v. Ferrin*, 23 Kan. App. 2d 47, 53-54, 926 P.2d 680 (1996); but see *Greene v. Product Mfg. Corp.*, 842 F. Supp. 1321, 1326 (D. Kan. 1993) (rejecting argument that Kansas recognizes strict liability with abnormally dangerous activities and in a second form when a defendant brings a harmful substance onto its property and allows it to escape). We consider those cases next.

In *Koger*, property owners sued neighboring ranchers for damages caused by a fire originating on the ranchers' property when a burning ban was in place because of dry and windy conditions. The defendants did not set the fire. An employee simply noticed smoke rising on ranch property, took measures to put it out, and then left, believing the fire had been extinguished. But the fire reignited or continued to spread to the neighbor's property. The plaintiffs argued that putting out the fire was an inherently dangerous activity and that the defendants were strictly liable for "failing to take all means possible to extinguish" it. 23 Kan. App. 2d at 52. They argued liability arose from *Rylands*.

The Court of Appeals disagreed with plaintiffs and applied the abnormally dangerous activities test used in *Williams* to deny plaintiffs relief; but in the process the court attempted to distinguish *Atkinson*, *Berry*, and *Klassen*, because they were water law cases. Thus, it stated in dicta that precedent was limited to the absolute nuisance theory. 23 Kan. App. 2d at 53-54. In doing so, the *Koger*

court seemingly acknowledged an exception for cases involving water contamination. This, at least, is how the district court in this case interpreted *Koger* when it read it to mean that *Williams* "very carefully left strict liability for water pollution in place."

In *Greene*, the United States District Court for the District of Kansas interpreted our strict liability caselaw differently. And unlike the *Koger* claim, the claim in *Greene* specifically involved recovering costs for cleaning up groundwater pollution caused by the defendant's metal fabrication business. The defendant argued two forms of strict liability arising from *Ryland* existed, but the federal court held that there was but one strict liability rule in Kansas, stating:

"Our reading of *Williams* indicates that the Kansas Supreme Court intended to use Sections 519 and 520 to analyze claims involving abnormally dangerous substances and activities. While it did not repudiate *Rylands*, it recognized that the Restatement embodies the modern concept of strict liability and provides a series of factors to help guide the determination of when a substance or an activity is abnormally dangerous." 842 F. Supp. at 1326.

The *Greene* court then examined whether the defendant's metal fabrication business was an abnormally dangerous activity. 842 F. Supp. at 1327. We agree with *Greene*'s interpretation of the scope of our *Williams* decision.

Therefore, as adopted and discussed in *Williams*, 241 Kan. 102, Syl. ¶¶ 7, 8, the general rule imposing strict liability in tort law for abnormally dangerous activities stated in the Restatement (Second) of Torts § 519 provides: (a) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he or she has exercised the utmost care to prevent the harm; and (b) this strict liability is limited to the kind of harm the possibility of which makes the activity abnormally dangerous.

In determining whether an activity may be determined abnormally dangerous, the Restatement (Second) of Torts § 520 sets forth the following factors: (a) existence of a high degree of risk of some harm to the person, land, or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to

which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

The progression of our caselaw cannot be ignored by attempting—as the class does—to rely on *Gilmore* and other early water contamination cases that predate *Williams* to create a second form of strict liability apart from the test adopted in *Williams*. By 1917, Kansas clearly embraced the *Rylands* doctrine, which was the precursor to the modern concept of the abnormally dangerous activity doctrine in the Restatement §§ 519 and 520. By 1987, this court in *Williams* adopted that concept in the form of the Restatement's abnormally dangerous activity test. That adoption was reaffirmed in *Falls v. Scott*, 249 Kan. 54, 60-61, 815 P.2d 1104 (1991). The district court's order failed to recognize this progression, in part, because of the distraction created by the dicta in *Koger*. We hold that the class' strict liability claims in tort alleging water contamination are governed by the Restatement's abnormally dangerous activity test. Language to the contrary in *Koger* is disapproved.

We must now address the district court's holding granting the class judgment as a matter of law on the strict liability claim.

*Standard of Review*

Appellate courts apply the same standard as trial courts when considering whether judgment as a matter of law is proper under K.S.A. 60-250. *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 267, 225 P.3d 707 (2010).

" ' "When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict." ' [Citations omitted.]" *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see, *e.g.*, *Smith*, 285 Kan. at 40 ("In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party.").

*Discussion*

Presenting alternative arguments, BP first argues it was entitled to judgment as a matter of law on the strict liability claims—instead of the class—because all the evidence supports its position that it did not engage in an abnormally dangerous activity. But if this court disagrees and finds there is a factual dispute, BP argues the jury's verdict resolved that dispute and the trial court erred by overturning it. We begin by clarifying the substance of the plaintiffs' strict liability claims.

The jury was instructed to determine whether BP's "remediation" constituted an abnormally dangerous activity. This focus on remediation—as opposed to BP's actions while operating the refinery—reflects adherence to the trial court's pretrial summary judgment ruling that K.S.A. 60-513(b)'s 10-year statute of repose barred all strict liability claims relating to the discontinued refinery operations. But the jury instructions were less than clear. Instruction 4 first told the jury the class was seeking damages stemming from BP's "failure to clean up the refinery contamination"; but it then also instructed that the class claimed BP was strictly liable "for their clean up of the refinery contamination." In Instruction 9, the jury was told that "Kansas law provides that strict liability applies to conduct involving contamination of water resources, because of the importance of clean, safe water"; but then the jury was also told that the class "must prove Defendants' remediation constituted an 'abnormally dangerous activity' as it relates to the Class."

BP correctly argues that the posture of this case, at least as it relates to BP's pre-1970's conduct, is similar to *United Proteins, Inc. v. Farmland Industries, Inc.*, 259 Kan. 725, 915 P.2d 80 (1996), in which the trial court held that strict liability and negligence claims for contamination of the plaintiff's aquifer with a

chemical were barred by the statute of repose. It then limited the plaintiff's recovery to harm caused by the defendant's actions during the limitations period and later entered judgment for the plaintiff under its trespass and nuisance theories. On appeal, this court reversed and entered judgment for the defendant. In recognizing the seemingly harsh result, this court stated:

"It is essential to first realize and understand that while this might have been a relatively simple case of negligence or strict liability, neither of those theories were available because of UPI's delay in filing. With those two potentially winning theories lost by UPI's untimeliness, UPI was left in the unenviable position of pursuing theories which alleged Farmland had engaged in some tortious conduct within the limitations period." 259 Kan. at 728.

Like the plaintiff in *United Proteins*, the plaintiff class here is in the unenviable position of pursuing a strict liability theory related to BP's conduct *after* the refinery closed. This explains why the class argues now it was BP's "control over and maintenance of the remediation program" that caused the spread of the groundwater pollution. And a central feature of this claim is the belief that BP did not do enough to clean up the contamination, even though BP knew that the contaminants would inevitably reach the groundwater if not fully removed. This is also reflected in the class' opposition to BP's summary judgment motion, in which the class argued:

"Defendants' management of the pollution has been to leave massive amounts of pollution in the soil and groundwater—thereby saving money—and let nature take its course. The substantially certain result, known since at least the 1980's, of leaving the pollution in the ground was that it would, and has, spread into neighborhoods and beneath schools."

This theme carried forward in the appellees' brief, in which the class stated that "[t]o save itself money, BP chose not to remove that pollution, but to leave it where it was, *knowing it would spread with the movement of the groundwater unless BP chose to do something to stop it.*" (Emphasis added.)

It is also worth emphasizing that the class is not arguing on appeal that BP is strictly liable for the actions BP took while remediating. The class takes issue with BP's failure to do more. The jury instructions seemed to contradict this position when they advised

the jury that the class claimed BP should be "strictly liable to the Plaintiff Class for their clean up of the refinery contamination." But if that is what the jury was to determine, BP correctly cites evidence indicating its *activities* reduced the benzene levels to some degree, although the class considers those results grossly inadequate.

It is not entirely clear which activity or activities or failure or failures to act the trial court found were abnormally dangerous when it granted judgment as a matter of law. It held that the " '[d]efendants' remediation or cleanup is, as a matter of law, an 'abnormally dangerous activity.' " But it also cited the class' claim that the "storage and treatment" of the contamination amounted to an abnormally dangerous activity. And the trial court also cited its previous summary judgment order, in which it held that there was a question of fact for the jury as to whether BP is strictly liable for its "management of the remediation project."

In its findings-of-fact section in the posttrial order, the trial court held it was undisputed that the pollution had spread from the former refinery grounds and contaminated the groundwater in the adjacent neighborhoods. And BP does not dispute that some of the wastes generated by the former refinery were volatile chemicals. The trial court also found that BP had acknowledged its responsibility to address residual petroleum products attributable to the refinery, and it defined BP's theory of the case as acknowledging partial responsibility for the contamination and claiming that it was in fact actively cleaning it up through work as supervised by KDHE.

But the trial court also noted BP's engineers and experts admitted they failed to identify a large body of pollution spreading into Neodesha and concluded:

"Given the Defendant's admissions and the evidence here, no rational juror could return a verdict stating that Defendants were not guilty of contaminating the groundwater underneath Neodesha. The contaminants involved in this case are some of the most dangerous known to mankind. They do not naturally occur, thus are 'non-natural to the land,' were obtained elsewhere, and Defendants' prior refinery operations had no connection with the products of this land or the development of its natural resources."

This holding appears to relate to a per se strict liability as a matter of law theory, not the abnormally dangerous activity holding stated by the district court. Admittedly, this distinction is not entirely clear because the district court continued in the same paragraph to conclude:

" 'In *Williams*, [Defendants' predecessor] Amoco successfully argued that 'natural gas, unlike salt water, *oil pollution or chemical discharge*, does not 'present a high degree of risk of harm,' [citation omitted]. In contrast here, the contaminants and oil pollution are abnormally dangerous. Even though a complete analysis under *Williams* is probably unnecessary, the Court will do the analysis. The Defendants' remediation or cleanup, or lack thereof[,] is as a matter of law an 'abnormally dangerous activity.' "

Then the trial court examined the six Restatement § 520 factors. For the first (existence of a high risk of harm), the district court's only finding was a conclusory statement that there was a high risk of harm. It is impossible to discern whether the district court was referring to the toxic nature of the pollutants or some activity BP was engaged in, such as the storage or remediation of the contamination. Regarding the second factor (the likelihood that the resulting harm will be great), the district court held that BP admitted that it was. But this statement is inaccurate to the extent that BP argues its remediation activities were successful at reducing benzene levels. Regarding the third factor (the inability to eliminate the risk through the exercise of reasonable care), the district court made the conclusory finding that reasonable care would not eliminate the risk. Regarding the fourth factor (extent to which the activity is a matter of common usage), the district court held remediation was not a common usage, distinguishing it from natural gas production. But this finding is debatable, depending on how the question is defined. For example, remediation could be considered common to areas containing contamination. Regarding the fifth factor (whether the activity is appropriate for the place it is carried on), the district court held that "Defendants' remediation is inappropriate to the area, especially the area outside the former refinery grounds and outside the plume which Defendants represented to the public." This statement seems to relate to the creation of contamination and not the remediation of it. Regarding the sixth

factor (the value to the community), the district court held the value of BP's remediation was outweighed by its dangerous attributes.

Tellingly, the district court's posttrial ruling contains no finding that BP's remediation and clean-up activities caused any purported harm, cites no evidence to support any such finding, and ignores a critical element for imposing strict liability in tort, *i.e.*, limiting it to the kind of harm that makes the activity abnormally dangerous. See Restatement (Second) of Torts § 519. So not only did the district court blend theories of per se strict liability with the abnormally dangerous activity test adopted in *Williams v. Amoco Production Co.*, 241 Kan. 102, Syl. ¶ 8, 734 P.2d 1113 (1987), as discussed above, its ruling is incomplete and demonstrates why the district court had originally ruled that it was appropriate to allocate the decision making to the jury. As the district court held in its earlier summary judgment order:

"The Court finds there is a question of fact for a jury to determine whether the Defendants are or are not strictly liable for their management of the remediation project in Neodesha. Further, and as more fully set forth herein[,] if Defendants are found strictly liable, th[en] that liability 'is limited to the kind of harm the possibility of which makes the activity abnormally dangerous.' [citing *Williams*]."

The commentary to the Restatement (Second) of Torts § 520 suggests that the inquiry into whether an activity is abnormally dangerous is a question of law courts should determine, based upon all the factors listed in that section. See *Falls*, 249 Kan. at 60-61. But this court has adopted a different approach, because this inquiry may require factual as well as legal determinations. When the facts are undisputed, whether an activity is abnormally dangerous is a question of law decided by the court. If the facts are disputed, this court has held that the question is to be determined by the jury. *Pullen v. West*, 278 Kan. 183, 190-91, 92 P.3d 584 (2004) (quoting *Falls*, 249 Kan. 54, Syl. ¶ 3).

Under this caselaw, the jury was instructed to determine whether BP engaged in an abnormally dangerous activity and the trial court erred by overturning the jury's finding. BP correctly argues there were disputed facts pertaining to the following factors: (1) whether the remediation activities involved a high degree of

risk of harm that could not be eliminated through the exercise of reasonable care; (2) whether remediation was appropriate to the area; and (3) whether BP's remediation activities benefitted the community. BP cites testimony from its groundwater hydrologist and KDHE employees, indicating that benzene levels were decreasing due to the trench "extraction systems" and the addition of sulfate solution in the wells. BP also cites testimony from the plaintiffs' hydrogeologist indicating that the pumps in the trench were working, but they might not have been working at optimum levels. He also indicated that a long-term commitment to maintaining the wells was required. Given the allegations as framed and the existence of disputed facts, we hold that the jury's verdict should not have been disturbed. See *Pullen*, 278 Kan. at 190-91. The trial court erred by overturning the jury's verdict.

Based upon this determination, we do not need to address BP's claims that its activities or lack thereof did not constitute an abnormally dangerous activity as a matter of law or that the class failed to establish causation. The jury's verdict makes that unnecessary. We reverse the trial court's order granting judgment as a matter of law on the plaintiffs' strict liability claim.

*The Conditional Grant of a New Trial*

The district court held a new trial was proper on the same grounds that it entered judgment as a matter of law, concluding it erred by instructing the jury to determine liability. BP argues the district court erred by conditionally granting a new trial as a matter of law because it lacked the authority to enter a conditional new trial order. But given our decision that the jury verdict should not be disturbed in this case, further consideration of this issue is moot.

Reversed and remanded with directions to the district court that the jury verdict be reinstated and final judgment entered for the defendants.

JAMES R. FLEETWOOD, District Judge, assigned.